**FIRST EBENEZER BAPTIST CHURCH, LaGree Baptist Church, Christ Fellowship Baptist Church, Good Samaritan Pentacostal Church, New Mt. Zion Pentecostal Church, Brownsville Baptist Church, and all others similarly situated, Plaintiffs,**

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Defendant.**

No. 94 Civ. 7128 (AGS).

United States District Court, S.D. New York.

Aug. 5, 1997.

---

Stephen T. Mitchell, Malik K. Cutlar, New York City, for Plaintiffs.

Charles E. McTiernan, Jr., Richard J. Giglio, New York City, for Defendant.

### OPINION AND ORDER

SCHWARTZ, District Judge.

Section 76 (" § 76") of the New York Public Service Law ("PSL") requires electric utilities in New York state to charge a lower "domestic" rate, rather than the higher "commercial" rate, to corporations or associations organized and conducted in good faith for religious purposes which use such electricity in connection with religious purposes.

Plaintiffs Brownsville Community Baptist Church ("Brownsville Baptist"), New Mt. Zion Pentecostal Church ("New Mt. Zion"), Christ Fellowship Baptist Church ("Christ

Fellowship"), Good Samaritan Pentecostal Church ("Good Samaritan") and LaGree Baptist Church ("LaGree") are predominantly African–American and Latino churches that claim that defendant Consolidated Edison Company of New York, Inc. ("Con Edison") denied them the preferential rate in violation of the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution and in violation of 42 U.S.C. §§ 1981 and 1983. Plaintiffs have also made various claims under New York state law. Before the Court are the parties' cross-motions for summary judgment and plaintiffs' motion for class certification.[1]

For the reasons stated below, defendant's motion for summary judgment on plaintiffs' federal claims is granted, plaintiffs' motion for summary judgment is denied and plaintiffs' motion for class certification is denied as moot. The Court declines to exercise supplemental jurisdiction over plaintiffs' claims under New York state law.

### FACTUAL BACKGROUND

#### I. PSL § 76 and Con Edison's Documentation Requirements

As noted above, PSL § 76 requires utilities in New York state to charge religious organizations the same rate they charge domestic customers, rather than the higher "commercial" rate they normally charge to corporations. It provides in pertinent part:

No gas corporation, electric corporation or municipality shall, directly or indirectly, charge, demand, collect or receive from any corporation or association organized and conducted in good faith for religious purposes ... a rate ... for any gas or electric service utilized exclusively in connection with such religious purposes .... greater than the rates or charges charged, demanded, collected or received by such gas corporation, electric corporation or municipality from domestic consumers ...

---

1. Also outstanding is plaintiffs' motion of December 15, 1995 to remove as a named plaintiff First Ebenezer Baptist Church. Defendant has not opposed this motion and the motion is hereby granted. Because the motion to remove was outstanding at the time that the other motions addressed by this opinion were submitted, First Ebenezer remains a plaintiff in the caption on this opinion.

During the period 1965–1994, Con Edison charged religious customers the preferential domestic rate only if the customer first provided Con Edison with a (1) Certificate of Incorporation as a religious organization and (2) a New York State tax exempt certificate. There is no dispute that each of the plaintiff churches has a Certificate of Incorporation as a religious organization and a New York State tax exemption certificate. (*See* Exhibit to Defendant's Motion for Summary Judgment ("D.Ex.") B at 10–11 (LaGree), D. Ex. D at 9, 12 (Brownsville), D. Ex. E at 5–7 (New Mt. Zion), D. Ex. F at 69, 80 (Christ Fellowship), D. Ex. C at 13–16 (Good Samaritan)).

Although plaintiffs have the documents required to obtain the preferential rate, several of the plaintiff churches did not actually receive the preferential rate for extended periods. For example, plaintiff Brownsville Baptist was on the commercial rate from 1973 through 1995, plaintiff LaGree was on the commercial rate from 1975 to 1993, plaintiff Christ Fellowship was on the commercial rate from 1985 to 1993 and plaintiff Good Samaritan was on the commercial rate from 1975 to 1995. *See* Defendant's Counter 3(g) Statement at ¶¶ 11–14.

The plaintiff churches claim that they failed to obtain the preferential religious rate because Con Edison concealed from them the availability of this rate. *See* Third Amended Complaint at ¶ 69. Con Edison disputes this charge and claims that, in failing to obtain the preferential religious rate, "[e]ither plaintiffs did not rely on what Con Edison told them or plaintiffs did not act with due diligence." See Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem." at 21).

## II. Con Edison's Outreach Program

In response to concerns that eligible churches might not be receiving the preferential rate, in 1991 and 1992 Con Edison conducted an "outreach" throughout its service territory informing commercial customers with "religious sounding" names of the religious rate and explaining how they could obtain the rate. In connection with this program, Con Edison selected 1,259 customer accounts for review, and, after eliminating approximately 500 in a pre-screening process, reviewed 728 accounts for eligibility and sent letters to 279 customers informing them of their possible eligibility for the special rate. (D.Ex. W). Plaintiffs Brownsville, Good Samaritan, and Christ Fellowship all received outreach letters during this period. (D. Ex. S, T and U).

## III. The December 1994 Settlement

In December 1994, as a result of an investigation by the New York State Attorney General into allegations that certain religious customers were being denied the religious rate, Con Edison entered into an agreement with the State of New York pursuant to which it agreed to relax its procedures for verifying customer eligibility. (D.Ex. M). Specifically, Con Edison agreed to accept a copy of articles of incorporation as a religious corporation as verification of the customer's entitlement to the lower rate. (D. Ex. M ¶ V). As part of the settlement, Con Edison also agreed to mail notices of the settlement to its customers, simplify its application form, provide employee training concerning the new documentation rule, and advertise the new eligibility rules through newspaper advertisements and radio commercials. (D. Ex. M ¶ XII).

In 1995, also pursuant to the settlement with the Attorney General, Con Edison agreed to provide refunds with interest to religious customers who were wrongfully overcharged during the period 1988–1994. (*See* D. Ex. M at XIII). Accordingly, Con Edison provided plaintiffs Brownsville, LaGree, Christ Fellowship and Good Samaritan refunds from July, 1988 until the point at which they were placed on the religious rate, at 18% interest plus a 20% settlement adjustment. New Mt. Zion did not receive a refund because it had been on the religious rate since 1987.

## IV. Plaintiffs' Claims

Plaintiffs now claim damages under both federal and state law, alleging that Con Edison used its documentation policy to conceal from minority churches the availability of the special religious rate and that the documen-

tation requirements for obtaining the preferential rate unfairly burdened African–American and Latino churches.

Plaintiffs' federal claims allege deprivation of plaintiffs' right to contract under 42 U.S.C. § 1981 and denial of due process and equal protection under the Fourteenth Amendment in violation of 42 U.S.C. § 1983. Plaintiffs' state claims are for violation of P.S.L. § 76, violation of P.S.L. § 65 (prohibiting utilities from charging different rates to similarly situated corporations), common law fraud, negligent misrepresentation, money had and received and violation of New York General Business Law § 349.

Plaintiffs have moved for partial summary judgment with regard to their claims under the Fourteenth Amendment, PSL § 76 and money had and received. Plaintiffs have also moved for class certification pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 23. Defendant Con Edison has cross-moved for summary judgment on plaintiffs' federal claims.

## DISCUSSION

### I. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1223 (2nd Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Id.* at 1224.

Having reviewed the evidence in this case in the light most favorable to plaintiffs, the Court concludes that plaintiffs' evidence fails to create a material issue of fact with regard to plaintiffs' federal claims.

### II. Plaintiffs' Claim Under 42 U.S.C. § 1981

42 U.S.C. § 1981(a) provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens ...

Plaintiffs claim that in implementing its documentation policy, Con Edison deliberately misinformed "predominantly African–American and Latino churches along with other racial and/or ethnic minority churches," and thus "denied the plaintiffs the ability to contract for the religious rate for electric service in violation of 42 U.S.C. Section 1981." Third Amended Complaint at ¶ 44.

In order to succeed on a claim brought under Section 1981, plaintiff must prove a discriminatory *purpose* on the part of the defendant. *See General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982) ("we conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination"). Determining whether a defendant was motivated by an invidious discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977). "Subjects of proper inquiry" include the impact of the defendant's actions, departures from the normal procedural sequence and a history of discriminatory actions. *Id.* at 264–68, 97 S.Ct. at 562–65.

In the absence of direct evidence, plaintiffs attempt to prove discriminatory intent circumstantially by alleging that:

(a) Con Edison's documentation policy had a disparate impact on minority churches;

(b) Con Edison has a history of discriminating against minorities; and

(c) Con Edison departed from its own procedural norms in applying its documentation policies pursuant to PSL § 76.

None of these allegations is supported by evidence sufficient to create a material dispute of fact.

## A. Disparate Impact

Plaintiffs contend that an inference of discriminatory intent is warranted on the ground that Con Edison's PSL § 76 documentation policy had a disparate impact on minority churches because a majority of the churches that were overcharged by Con Edison are located in predominantly black and Hispanic neighborhoods. Pl. Mem. at 9. Plaintiffs base this argument on a study they conducted showing that: (a) 1,172 of the 1,926 churches (approximately 61%) that received a refund from Con Edison are located in zip code areas with a 64% or higher black or Hispanic population and (b) of those 1,172 churches, 1,035 are located in areas in which the black and Hispanic percentage is 80% or higher. Pl. Mem. at 10. Plaintiffs' argument is unpersuasive for several reasons.

First, the fact that an otherwise racially neutral policy has a disparate impact on minorities does not prove intent to discriminate. *See Village of Arlington Heights,* 429 U.S. at 264–65, 97 S.Ct. at 563 ("action will not be held unconstitutional solely because it results in a racially disproportionate impact.").

Second, plaintiffs' "study" lacks credibility. According to plaintiffs' evidence, the analysis was performed by one paralegal (with no particular training in statistics or social science) using only U.S. Census data for 1990 and Con Edison's list of churches that had received refunds. (*See* Pl.Ex. P). There is no explanation of methodology, and the "study" fails to use any control groups to analyze the data over time, or to place the data in any sort of meaningful context. Given these methodological problems, it is not surprising that plaintiff's "study" ignores the fact that as of June, 1994, the majority (53%) of Con Edison customers on the religious rate were located in zip codes that were 64% or more black or Hispanic, a fact which would explain why the majority of the customers receiving refunds were also located in zip codes that are predominantly black or Hispanic.

Finally, even plaintiffs concede that Con Edison's documentation policy was a reasonable attempt to prevent non-qualifying customers from fraudulently obtaining a special rate. For example, representatives of the four black plaintiff churches conceded in deposition testimony that they would have requested the same documentation that Con Edison requested in order to verify an entity's claim that it was a bona fide religious organization. (*See* D. Ex. AA at 61–64 (LaGree), D. Ex. D at 54–56 (Brownsville), D. Ex. E at 61 (New Mt. Zion) and D. Ex. F at 89–90 (Christ Fellowship)). Plaintiffs also concede that there is no reason to believe that such a policy would unfairly burden minority churches. For example, David Kelley, of plaintiff Christ Fellowship Baptist Church, author of a study on black churches in New York, testified that at least 90% of black churches in New York City have a certificate of incorporation and a tax exempt certificate. (*See* D. Ex. F at 41, 123). Indeed, representatives of the plaintiff churches all admitted in deposition testimony that their churches had the required documents. (D. Ex. B at 10–11 (LaGree), D. Ex. D at 9–12 (Brownsville), D. Ex. E at 5–7 (New Mt. Zion), D. Ex. F at 69, 80 (Christ Fellowship), D. Ex. C at 13–16 (Good Samaritan)).

Thus, plaintiffs have failed to offer evidence of disparate impact sufficient to warrant an inference of discriminatory intent on the part of Con Edison.

## B. History of Discriminatory Actions

Plaintiffs also attempt to show discriminatory intent through Con Edison's alleged history of discrimination against minorities. In support of this allegation, plaintiffs rely exclusively on the testimony of one former Con Edison employee, Brenda Crocker, who testified that Con Edison's "treatment of its black customers was, and continues to be, racist." Pl. Mem. at 8. Ms. Crocker also testified that white customers were given faster service than black customers, that Con

Edison was quicker to terminate the service of black customers and that Con Edison has retaliated against black employees who have spoken out in the past. Pl. Mem. at 8–9.

While Ms. Crocker's testimony raises some concern about Con Edison's treatment of minority customers and employees, the probative value of her testimony in this case is extremely limited. Ms. Crocker conceded that she had minimal involvement in Con Edison's documentation policy with regard to PSL § 76 and most of her testimony involves vague allegations of past discrimination on the part of Con Edison, completely unrelated to the PSL § 76 documentation policies. *See Flagg v. Control Data*, 806 F.Supp. 1218, 1223 (E.D.Pa.1992), ("[c]onclusory allegations of generalized racial bias do not establish discriminatory intent."), *aff'd.*, 998 F.2d 1002 (3rd Cir.1993).

To the extent that her testimony relates directly to Con Edison's PSL § 76 documentation policies, it still fails to · create a material issue of fact. Indeed, Ms. Crocker testified that she does *not* believe that Con Edison discriminated against minority churches in its PSL § 76 documentation policies. For example, Ms. Crocker testified that, "as far as ... the rates were concerned" Con Edison did not discriminate against minority customers. (*See* Exhibit to Defendant's Reply Certification in Support of Summary Judgment ("D.Rep.Ex.") L at 77). Ms. Crocker also testified that she was never instructed by her superiors not to tell church ·customers about the religious rate and "the procedure was that they· were informed of the rate" at the time that the application was taken. (D. Rep. Ex. L at 12). She also testified that she did not know of any Con Edison employee who failed to tell a customer about the religious rate because the customer was black and that she never saw any Con Edison employee make misrepresentations about the religious rate because the customers were black. (D. Rep. Ex. L at 123).

Moreover, the history of Con Edison's PSL § 76 documentation policy also includes its massive outreach program in 1991–1992, in which it reviewed 1,259 customer accounts with "religious sounding" names for eligibility for the religious rate, and sent letters to 279 customers informing them of their possible eligibility for the rate. Such an extensive program, aimed at informing churches of the availability of the religious rate, also evidences a complete lack of discriminatory intent. Even plaintiffs concede that such a program constitutes a good faith attempt to inform churches of the availability of the religious rate. (D. Ex. D at 62–3, D. Ex. E at 98).

Accordingly, plaintiffs have not presented evidence of a history of discriminatory actions on the part of Con Edison sufficient to warrant an inference that the PSL § 76 documentation policy was discriminatory in intent.

**C. Departure from Procedural Norms**

■ Plaintiffs' allegation of a departure from procedural norms is based on the assertion that although it is Con Edison's stated policy to inform religious customers of the religious rate and the documentation requirements when a customer applies for service, Con Edison allegedly failed to inform the plaintiff churches of their eligibility for the religious rate when they first applied for service with Con Edison and, in fact, did not inform them of the religious rate until 1992. Pl. Mem. at 6. Plaintiffs' allegation is not supported by the evidence.

A number of witnesses who testified in support of plaintiffs on this point admitted that they had no role or were not present when the churches opened their accounts. For example, Inez Martinez of Good Samaritan testified that she did not "have anything to do with applying for electric service from Con Ed" (D. Rep. Ex. B at 18); David Kelley of Christ Fellowship testified that he had never applied for service from Con Edison on behalf of a religious organization ·(D. Rep. Ex. C at 66); William Cook of Brownsville Baptist testified that he had no contact with Con Edison other than a single conversation in 1994 in which he inquired about obtaining the religious rate for his church (D. Rep. Ex. D at 11); and Alphonso Jones of LaGree testified that his only contact with defendant was with a Con Edison representative who visited the church regularly in order to ad-

vise it on how it could lower its electricity bills by changing its light fixtures (D. Rep. Ex. E at 11–16).

Another witness who testified in support of the plaintiffs on this point, Edith Burgess of New Mt. Zion, testified only that she was present when her mother-in-law opened the account and did not recall Con Edison's representative telling them about the religious rate (D. Rep. Ex. F. at 16–17). However, New Mt. Zion's 1968 application for electric service contains a notation that reads "customer does not want to apply for the religious rate," thus strongly suggesting that Ms. Burgess and her mother-in-law were told about the religious rate but declined to apply for it (D.Ex. HH). Thus, plaintiffs' evidence fails to establish that Con Edison departed from its normal procedures by failing to inform minority churches about the religious rate when they opened their accounts with Con Edison.

■ Plaintiffs allege several other departures from procedural norms on the part of Con Edison, which, they claim, evidence a discriminatory purpose. However, plaintiffs fail to explain why these acts constitute departures or how they reveal a discriminatory purpose on the part of Con Edison.

For example, plaintiffs offer the fact that a Con Edison representative visited one of the plaintiff churches for three consecutive years to help the church lower its electricity costs by changing its lights, but never informed the church of its eligibility for the religious rate. (Pl.Ex. E at 101–104). However, plaintiffs fail to explain why this constitutes a departure from Con Edison's policy, which was only to inform churches of the religious rate when they first applied for service. Plaintiffs also ignore the obvious fact that repeated visits by a Con Edison representative over a three year period to help a minority church lower its electricity costs are hardly evidence of discriminatory intent.

Plaintiffs also claim that a Con Edison executive admitted in deposition testimony that a predominantly black church was denied the religious rate because of the church's failure to provide Con Edison with a church charter, when Con Edison's policy required only that the customer provide a

certificate of incorporation. Pl. Mem. at 7. However, the testimony of this witness, James O'Toole, indicates that the church had failed to supply Con Edison with the documentation required to obtain the religious rate and that Con Edison made a special effort to work with the church to help it obtain the rate. Specifically, Mr. O'Toole testified that Con Edison's file indicated that the church was having difficulty locating all the required documents and "we were going to give them a period of time to find what they needed to find … and if we didn't receive it we were going to get back to them and remind them that we needed that in order to complete the case." (Pl.Ex. K at 132).

■ Finally, in support of their contention that Con Edison departed from procedural norms in applying its PSL § 76 policy, plaintiffs claim that Ms. Crocker, the former Con Edison employee, testified in her deposition that Con Edison failed to process the applications of minority churches properly. Pl. Mem. at 7–8. However, Ms. Crocker testified that Con Edison's practices with regard to processing service applications were "sloppy across the board" and not intentionally directed at minority churches. (D. Rep. Ex. L at 86).

Thus, plaintiffs have failed to identify any procedural departures sufficient to warrant an inference of discriminatory intent on the part of Con Edison.

## III. Plaintiffs' Claim under Section 1983

42 U.S.C. Section 1983 provides for liability as to:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution…

■ Plaintiffs' Section 1983 claim is that "although the New York Legislature created a permissible classification for religious insti-

tutions to receive lower utility rates, the defendant's documentation policy created additional criteria to receive the lower utility rate which was not rationally based ... which is exactly what the Equal Protection Clause seeks to prohibit." Plaintiffs' Reply Memorandum at 2.

■ As is the case with Section 1981, Section 1983 requires proof of discriminatory intent. *Village of Arlington Heights v. Metro Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.") Thus, plaintiffs' Section 1983 claim fails for the reasons stated above.

■ Plaintiffs' Section 1983 claim also fails due to the absence of state action in this case. A plaintiff alleging a violation of Section 1983 must show that the alleged deprivation of constitutional rights was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Plaintiffs claim that in this case Con Edison was acting as a "state actor" because the State of New York designated Con Edison to determine which customers were eligible for the special religious rate under PSL § 76. Pl. Mem. at 21. However, plaintiffs' argument is not supported by the applicable case law.

In *Jackson v. Metropolitan Edison,* 419 U.S. 345, 349, 95 S.Ct. 449, 452–53, 42 L.Ed.2d 477 (1974), the Supreme Court held that a state regulated utility with a governmentally protected monopoly would not be considered a "state actor" absent a showing of "a sufficiently close nexus between the State and the challenged action of the regulated entity to say that the action of the utility may be fairly treated as that of the state itself." In *Taylor v. Consolidated Edison Co.,* 552 F.2d 39, 45 (2d Cir.1977), the Second Circuit applied *Jackson* and held that Con Edison's failure to provide a hearing

before terminating a customer's service did not constitute state action despite "extensive intervention" by New York State in the area of utility termination. In this case, as in *Taylor,* there is no evidence that the state formulated, or is in any way responsible for, Con Edison's PSL § 76 documentation policy. As such, the policy can not be deemed "state action." *See also Austin v. Consolidated Edison Company,* 788 F.Supp. 192, 196 (S.D.N.Y.1992) ("Con Edison is not a government agency and is not itself subject to the constitutional restrictions plaintiffs would impose ...").

Plaintiffs' attempt to distinguish *Jackson* and *Taylor* on the grounds that they involved complaints regarding the defendant's provision of electricity, not a typical governmental function, rather than the setting of rates for electric service, which, plaintiffs claim, is a traditional governmental function. Pl. Mem. at 22. This is a distinction without a difference. Con Edison did not set the rates charged to churches for electric service but merely established a verification procedure in order to ensure that customers were charged the proper rates. Con Edison's implementation of this verification procedure pursuant to the state regulatory scheme does not establish a "sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Jackson* 419 U.S. at 351, 95 S.Ct. at 453.

■ Accordingly, plaintiffs' claim under Section 1983 is dismissed.[2]

## IV. Standing and Statute of Limitations

Defendant has also moved for summary judgment on the grounds that (1) plaintiffs lack standing because they had the documents required by Con Edison and therefore were not injured by defendant's documentation policy and (2) certain of plaintiffs' claims

---

2. Count III of the Third Amended Complaint also alleges a violation of the Due Process clause of the Fourteenth Amendment. However, the plaintiffs' motion papers identify the plaintiffs' Fourteenth Amendment claim only as an Equal Protection claim and do not develop the Due

Process argument. To the extent that plaintiffs also allege a violation of the Due Process clause of the Fourteenth Amendment, such action is also barred due to the absence of state action, for the reasons stated above.

are barred by the relevant statutes of limitations.

The Court need not address these arguments in light of the foregoing discussion.

## V. Plaintiffs' Claims under New York State Law

The Court declines to exercise supplemental jurisdiction over plaintiffs' state claims under 28 U.S.C. § 1367(c) which provides that a district court may decline to exercise jurisdiction over supplemental state law claims if it has dismissed all claims over which it has original jurisdiction.

## VI. Plaintiffs' Motion for Class Certification

Plaintiffs' motion for class certification is denied as moot in light of the Court's disposition of the parties' summary judgment motions.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment on plaintiffs' federal claims is granted and plaintiffs' motions for summary judgment and for class certification are denied. Having dismissed plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over plaintiffs' state claims. The Clerk of the Court is directed to enter judgment and close the file in this action.

SO ORDERED.