SUNRISE DEVELOPMENT, INC., "XYZ, Inc.," and "John Doe" Nos. 1 through 76, Plaintiffs,

v.

The TOWN OF HUNTINGTON, NEW YORK, Frank P. Petrone, as Town Board of the Town of Huntington, New York, Steven Israel, Mark Cuthbertson, Marlene L. Budd and Susan Scarpati–Reilly as Members of the Twon Board of the Town of Huntington, New York, Defendants.

No. CV 98–3336(ADS).

United States District Court, E.D. New York.

Feb. 3, 1999.

**764**

Bleakley Platt & Schmidt, White Plains, NY, William P. Harrington, of counsel, for plaintiffs.

Cullen and Dykman, Garden City, NY, James G. Ryan, of counsel, for defendants.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

By an Order dated October 8, 1998, this Court referred the following motions to United States Magistrate Judge Victor V. Pohorelsky pursuant to 28 U.S.C. § 636(b)(1) for a report and recommendation: the plaintiffs' motion for a preliminary injunction; the defendants' cross-motion to dismiss the complaint; and the plaintiffs' request for attorneys' fees.

The plaintiffs moved for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure ("Fed.R.Civ. P."), and requested that the defendants be prohibited from subjecting the plaintiffs' real estate development project to the provisions of a recently enacted amendment to the zoning law of the Town of Huntington. The plaintiffs also moved for attorneys' fees incurred in connection with their motion for a preliminary injunction under the provisions of 42 U.S.C. § 1988. In addition, the defendants made a cross-motion to dismiss pursuant to Rule 12(b)(6) based on their contentions that the plaintiffs' complaint was not ripe for adjudication and that the plaintiffs lacked standing under their New York State Quality Review Act claim. N.Y. Envtl. Conserv.Law § 8–0101 *et seq.* ("SEQRA").

On January 7, 1999, Judge Pohorelsky issued a Report recommending: (1) that the preliminary injunction motion should be granted because the plaintiffs met their burden of demonstrating irreparable harm and substantial likelihood of success on the merits of their claims; (2) that the defendants' motion to dismiss on ripeness grounds should be denied; (3) that the defendants' unopposed motion to dismiss the SEQRA claim for lack of standing should be granted; and (4) that the plaintiffs' motion for attorneys' fees should be denied as premature because there has been no final determination on the merits.

The Magistrate Judge recommended that the preliminary injunction require the Town of Huntington: (1) to reinstate the plaintiffs' application to the Town's Board of Appeals for Zoning; (2) to schedule a public hearing on the application as soon as its feasible; and (3) to render a decision on the plaintiffs' application for a special use permit under the law that existed prior to March 3, 1998. In addition, the Magistrate Judge recommended that the Town's Board of Appeals for Zoning decision on the application be published to the parties but that the district court expressly order that the decision not be considered "final

and binding" upon the plaintiffs, for the purposes of triggering limitations of time applicable to commencement of an Article 78 proceeding under New York Law, until the district court renders a final decision in this action.

On January 18, 1999, the plaintiffs filed a limited objection to the Report and Recommendation contending that the Magistrate Judge incorrectly ruled that the plaintiffs, Sunrise Development and XYZ, Inc., as distinct from the John Doe plaintiffs, did not suffer irreparable harm. In addition, the plaintiffs claim that they should have been awarded attorneys fees in connection with the preliminary injunction. The defendants filed their objections to the Report and Recommendation on January 25, 1999. The defendants argue that the Magistrate Judge erred when he recommended that the Court grant the plaintiffs' motion for preliminary injunction and when he failed to recommend that their motion to dismiss be granted.

■ Pursuant to 28 U.S.C. § 636(b)(1), any party may file written objections to the Report and Recommendation of the Magistrate Judge within ten days after being served with a copy. *See also* Fed. R.Civ.P. 72(a). Once objections are filed the district court is required to make a de novo determination as to those portions of the Report and Recommendation to which objections were made. *see* 28 U.S.C. § 636(b)(1); *Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir.1989). Although the district court may "receive further evidence or recommit the matter to the magistrate with instructions" (28 U.S.C. § 636[b][1]), a de novo determination does not require the recalling of witnesses. *See United States v. Raddatz*, 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980). Rather, in making such a determination, the district court may, in its discretion, review the record and hear oral argument on the matter. *See Pan Am. World Airways, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen &*

*Helpers of Am.*, 894 F.2d 36, 40 n. 3 (2d Cir.1990).

The Court has carefully reviewed Judge Pohorelsky's thoughtful, detailed and thorough Report and Recommendation, as well as all of the submissions and objections by the parties, and concurs with Judge Pohorelsky's recommendations for the reasons set-forth in his well-reasoned report.

Accordingly, it is hereby

**ORDERED,** that the defendants' motion to dismiss the entire complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure is **DENIED;** but that the motion to dismiss the SEQRA claim on the grounds that the plaintiffs lack standing is **GRANTED;** and it is further

**ORDERED,** that the plaintiffs' motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure is **GRANTED** to the extent that Town of Huntington is hereby ordered (1) to reinstate the plaintiffs' application to the Town's Board of Appeals for Zoning; (2) to schedule a public hearing on the application as soon as its feasible; and (3) to render a decision on the plaintiffs' application for a special use permit under the law that existed prior to March 3, 1998. In addition, the Town's Board of Appeals for Zoning decision on the application must be published to the parties but it is ordered that the decision not be considered "final and binding" upon the plaintiffs, for the purposes of triggering limitations of time applicable to commencement of an Article 78 proceeding under New York Law, until this Court renders a final decision in this action; and it is further

**ORDERED,** that the plaintiffs' motion for attorneys' fees pursuant to 42 U.S.C. § 1988 is **DENIED;** and it is further

**ORDERED,** that the plaintiffs' attorney shall serve copies of this Order on all counsel of record by certified mail, return receipt, within five (5) days of the date of this Order.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

POHORELSKY, United States Magistrate Judge.

Pending before the court is the plaintiffs' motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure to bar the defendants from subjecting the plaintiffs' real estate development project to the provisions of a recently enacted amendment to the zoning law of the Town of Huntington. Also pending before the court is the defendants' cross-motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Finally, the plaintiffs seek an award of attorneys' fees if they prevail on their motion. These motions have been referred to the undersigned magistrate judge pursuant to Title 28, Section 636(b)(1) of the United States Code for a report and recommendation. For the reasons that follow, the undersigned REPORTS and RECOMMENDS that the plaintiffs' motion for a preliminary injunction be granted, that their application for an award of attorneys' fees be denied with leave to renew upon a final disposition of this case, and that the defendants' motion to dismiss be granted in part and denied in part.

## FACTUAL BACKGROUND

The plaintiff Sunrise Development, Inc. is a Virginia corporation authorized to do business in New York and engaged in the purchase and development of land on which it builds congregate care facilities ("CCFs"). A CCF is a housing facility which provides daily living assistance to its residents, most of whom are senior citizens and many of whom are disabled.[1] A CCF is typically operated by a licensed home health care services agency which provides such services as assistance with bathing, dressing, bathroom usage, taking medicine and other similar daily living activities.

Noone Aff. ¶ 6. Residents are provided three cooked meals and snacks each day. Id. Recreational and therapeutic programs are also included in the CCF's services. Id.

The plaintiff Sunrise has proposed to build a CCF on Deer Park Avenue within the defendant Town of Huntington. The plaintiff John Does #1–76 are the unnamed future residents of the CCF. The plaintiff XYZ, Inc. is an as-yet unnamed licensed home health care services agency which will operate the CCF. The defendant Frank Petrone is the Town Supervisor and a Town Board Member. The remaining defendants—Steven Israel, Mark Cuthbertson, Marlene Budd, and Susan Scarpatti Reilly—represent the balance of the Town Board members.

Senior housing, the issue at the root of the present controversy, is and has been a matter of some concern to the Town. In November 1996, the Town established a Citizen's Advisory Committee ("CAC") which conducted a study and in 1997 made specific recommendations concerning housing for the elderly and disabled on Deer Park Avenue. At around the same time, in December 1996, Sunrise conducted extensive market research to determine whether there was a need for senior and handicapped housing in the Town and concluded that a shortage of this housing existed. Sunrise's research revealed a five-acre parcel of land on Deer Park Avenue in an R–40 zone within the Town as a suitable location for its proposed CCF. At that time, the Town Zoning Code (the "Code") permitted a CCF as an "as of right" use in an R–40 zoning district upon the issuance of a special use permit by the Town's Board of Appeals for Zoning ("BZA"). See Bert Aff. ¶ 2. The Code requires the BZA to issue the special use permit upon an applicant's compliance with certain requirements.

1. Sunrise describes the typical CCF resident as approximately 83 years old with one or more physical or mental impairments.

Sunrise issued a letter of intent to the property's owner expressing its intention to purchase the Deer Park Avenue property, and in April 1997 the property owner and Sunrise signed a Purchase Agreement. Sunrise then retained experts to assist it with the process of obtaining the special use permit required before a CCF could be built on the parcel. In July or August 1997, Sunrise submitted its initial application for the special use permit to the Town.

From the time of submission until September 1997, the Town conducted the required review process and Sunrise submitted plans and various documents as periodically requested by the Town. During this review period, the Town advised Sunrise to meet with a neighborhood association to discuss the proposed CCF. According to Sunrise, it was with some difficulty that it arranged a meeting for November 24, 1997. During the meeting, the association's president was openly hostile to, and the association expressed contempt for, the proposed CCF. After the meeting, the association voted to oppose construction of the Sunrise CCF.

In addition to the application, the Code requires that a public hearing be held on the proposed project prior to the issuance of a special use permit. Such a hearing on Sunrise's proposed CCF was initially scheduled for November 20, 1997. Sunrise contends, and the Town disputes, that on October 15, 1997, Richard Machtay, Planning Director of the Town, requested that Sunrise adjourn its public hearing to give him time to complete his review of the additional information. Noone Aff. ¶ 16. Although it believed its application to be

complete, Sunrise agreed to this adjournment because, in general, it tries to accommodate local zoning officials and because, in particular, it wanted a negative declaration under New York State's Quality Review Act ("SEQRA").[2] N.Y. Envtl. Conserv.Law, § 8–0100 *et seq.* Machtay had informed Sunrise that he was considering recommending a positive declaration to the BZA, which would add significant expense and approximately six months to the application process. Sunrise hoped that upon reflection Machtay would recommend a negative declaration.[3] Noone Aff. ¶ 16. After Sunrise requested the adjournment, the BZA set a new date of February 5, 1998 for the public hearing on Sunrise's application, presumably the next available date.

Meanwhile, in November 1997, the CAC submitted its report to the Town concerning its study of land use on Deer Park Avenue. The report recommended only limited regulation of CCFs, nursing homes, sanatoriums, and convalescent homes on Deer Park Avenue. In December 1997, shortly after the CAC report was issued, Town employees again asked Sunrise for additional information and, according to Sunrise, advised it to seek an adjournment of the hearing because review of the information was expected to require thirty days after its submission to the Town. Noone Aff. ¶ 17. Sunrise again agreed to this adjournment because it hoped to resolve the outstanding issues on the application before the public hearing. *Id.* A new hearing date was set for April 2, 1997. The defendants admit that Sunrise's "application to build a conforming [CCF] was ... fully submitted [by] February 27,

**2.** Under SEQRA, a positive declaration is required where a proposed action will have a significant environmental impact. If a positive declaration issues, an Environmental Impact Statement (EIS) may be required and public hearing on the environmental impact of the proposed action must be held. These procedures are costly and time consuming. A negative declaration, however, states that the proposed action will not have a significant impact on the environment and, therefore, no

EIS is required. *See* N.Y. Envtl. Conserv.Law, Art. 8.

**3.** Sunrise knew of a similar circumstance involving another developer where Machtay had at first intended to recommend a positive declaration but changed his position after he had time to digest the information relevant to that developer's proposed building. Sunrise hoped for a similar result in connection with its CCF. *See* Noone Aff. ¶ 16.

1998," Def's. Mem. Opp'n at 4–5, and they do not contest the plaintiffs' contention that as early as February 9, 1998, an application was submitted that met "every provision of the then-existing Zoning Code and requirements for issuance of a special permit." Noone Aff. ¶ 21; see Noone Reply Aff. ¶ 5; Machtay Reply Aff. ¶¶ 7–8.

On February 10, 1998, the Town adopted a resolution which scheduled a public hearing on a proposed Local Law entitled "A Local Law to Consolidate Certain Senior Citizen Uses" ("Local Law"). On March 3, 1997, before the public hearing on Sunrise's CCF could be held and before the BZA had reached a determination on Sunrise's application, the Town held the required public hearing on the proposed Local Law. The Town asserts that it sought to enact the Local Law merely to consolidate land uses in fewer zoning districts in conformity with the "1993 Comprehensive Plan Update" (the "Comprehensive Plan") for the Town. Machtay Aff. ¶ 26. The proposed law eliminated CCFs as an "as of right" use in all zoning districts within the Town except in R–RM zoning districts; vested approval of CCFs with the Town Board, versus the old law which vested this authority with the BZA; and imposed certain new dimensional requirements which, according to the plaintiffs, were more rigorous than the old law and which the Town knew Sunrise could not satisfy. Noone Aff. ¶ 18. Finally, and at the heart of the dispute here, the new law grandfathered (i.e., left the old law applicable to) only those special use permit applications that were pending when the new law was enacted and on which a public hearing had already been held.

At the public hearing on the Local Law, Town residents expressed what the plaintiffs contend are discriminatory views of the elderly and disabled. For example, one resident who would live near the proposed facility expressed her concern for her home's "value decrease" if the Sunrise CCF was permitted. Hearing Tr. at 45:11.[4] Another resident stated that the Local Law was "to prevent inundation by congregate care facilities whose appearance and activity would alter the residential character of Dix Hills." Id. at 47:10–14. One resident read from an editorial appearing in a local newspaper which referred to Deer Park Avenue as "Senior Alley." Id. at 51:9. In addition, a general view was expressed at the meeting that the CCF would be a drain on community resources such as fire and rescue services. Id. at 51–52.

Residents who spoke in favor of the CCF were cut short in their remarks with defendant Petrone telling one resident to "think of one more thing and then give up," id. at 97:22–23, because he would "be ready for congregate care" soon. Id. at 98:2–3. The meeting also included a somewhat heated interchange between the Board members and John Noone, the vice president of Sunrise. When Noone suggested that the decision to pass the Local Law had been made before the hearing, the defendant Israel informed Noone that "you are not coming before us to question our motives." Id. at 73:22–24. Further, Petrone informed Noone that "you came in on your stagecoach and you are going to go out on your horse." Tr. at 75:2–4.

After substantial discussion, the Board voted to enact the Local Law modifying it slightly to eliminate a proposed provision for 1,000–foot parking lot set-backs where a proposed CCF would abut a school. Machtay Aff. ¶ 37(f); Noone Aff. ¶ 28. Under ordinary circumstances, because the law was not in final form seven days prior to its passage at the public hearing, the Local Law would have taken effect on April 3, 1998, the day after the public hearing was to be held on the Sunrise application for a special use permit under the old law. N.Y. Mun. Home Rule Law § 20(4). Where an emergency exists, however, the town su-

4. In citations to the hearing transcript, the number preceding the colon refers to the page number and the numbers following the colon refer to the line numbers.

pervisor may certify the need for a law's immediate enactment despite last-minute changes to it, thereby causing the law to become effective on an expedited basis. *Id.* In this case, without identifying any emergency, Town Supervisor Petrone certified the need for immediate passage and the Local Law took effect immediately. As a result, CCFs no longer qualified for special use permits, and Sunrise's application for a special use permit was rendered nugatory because it was not grandfathered.

There are currently only four parcels within the Town zoned R–RM, the only zone where CCFs are an as of right use, and each of these four parcels is already fully developed with some type of senior housing. To locate a CCF in any zone other than an R–RM, the developer/builder must now apply for a zoning change, in contrast with the old law which permitted a CCF in other zoning districts upon the retention of a special use permit. While the issuance of a special use permit is an almost routine occurrence upon compliance with certain requirements, *see, e.g., North Shore Steak House, Inc. v. Board of Appeals of the Incorporated Village of Thomaston,* 30 N.Y.2d 238, 243, 282 N.E.2d 606, 609, 331 N.Y.S.2d 645, 649 (1972), the grant of a zoning change is not as easily obtained. Under the Code, to prevail on an application for a zoning change the applicant must prove first, that it cannot make a reasonable return on the property absent the zoning change, and second, that the need for the change is due to unique circumstances and not due to the general condition of the neighborhood. In addition, a zoning change requires approval at several different local governmental levels [5] which can take up to thirty-three months to accomplish, rendering the process significantly more costly and lengthy than that of a special use permit application. Finally, while the BZA must act on a special use permit application within sixty-

two days of submission, *see* Town Law §§ 274(a)(8), 274–b(6), the Town need not act at all on an application for a zoning change and need not give its reasons for a denial. See Noone Reply Aff. ¶ 19.

Because no public hearing had been held on Sunrise's application prior to the enactment of the Local Law, it was not grandfathered under the old law. Sunrise was now forced to attempt to meet the new, more difficult dimensional requirements and to undergo the application process for a zoning change. Despite the hurdles imposed by the Local Law, Sunrise attempted compliance. Sunrise reduced its proposed two and one half story CCF to two stories and purchased more property to comply with the new, larger set-backs. Sunrise admits, however, that it cannot meet certain of the requirements imposed by the new law. The plaintiffs recently negotiated an extension of its options on the subject property and they now expire on April 2, 1999.

Less than six months after the enactment of the Local Law, the Town approved a zoning change to permit the construction of a CCF by a Sunrise competitor which was located approximately one and one half miles away and which apparently faced no community opposition. See Noone Reply Aff. ¶ 8. This application had already been pending for more than twenty-two months at the time of the Local Law enactment. *Id.* A second application is presently undergoing the review process and was pending as of November 10, 1998. See Machtay Supp. Aff. ¶ 7.

The plaintiffs contend that the Local Law discriminates against it and the disabled in violation of the Due Process and Equal Protection Clauses as well as the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, the American's With Disabilities Act ("ADA"), 42 U.S.C. § 11201, and

---

**5.** The Town Planning Department, the Town Attorney, the Planning Board, and the Town Board itself must each review and approve a zoning change. *See* Code, §§ 198–127, 198–128.

SEQRA, N.Y. Envtl. Conserv.Law §§ 8–0101 et seq. (McKinney 1997). Sunrise alleges that the Town "succumbed to and adopted the most blatant and discriminatory stereotypes concerning seniors and individuals with disabilities." Noone Aff. ¶ 32. The Town's discriminatory conduct, the plaintiffs allege, includes intentionally delaying the application process to enable it to pass the Local Law which Sunrise contends prevents the construction of not only the Sunrise CCF but all CCFs within the borders of the Town. The plaintiffs rely on their FHA and ADA claims to seek a preliminary injunction to enjoin the application of the Local Law to their project, and to require instead that the Town apply the old law to Sunrise's application. Such relief, they maintain, is a "reasonable accommodation" as required by the FHA.

The defendants have countered by moving to dismiss the plaintiffs' complaint pursuant to Rule 12(b)(6). They assert that the federal claims are not ripe for adjudication because Sunrise has not yet been denied permission to build its CCF, and because Sunrise has not yet given the Town an opportunity to make a reasonable accommodation. The defendants also argue that the plaintiffs do not have standing to seek relief for the alleged violations of SEQRA.

## DISCUSSION

### I. MOTION TO DISMISS

#### A. Ripeness of the Federal Claims

"In the area of land use, the doctrine of ripeness is intended to avoid premature adjudication of administrative action." *Herrington v. County of Sonoma,* 857 F.2d 567, 568 (9th Cir.1988). Whether a matter is ripe for adjudication is a question of law. *Id.* The Supreme Court has stated that two factors must be considered in determining whether there is a ripe controversy: the "fitness of issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner,* 387 U.S. 136, 149,

87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The fitness factor requires a finding that "the initial decisionmaker [sic] has arrived at a definitive position on the issue that inflicts an actual, concrete injury," *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 193, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), that is, the adverse administrative action must be final. *See, e.g., Southview Assocs., Ltd. v. Bongartz,* 980 F.2d 84, 96 (2d Cir.1992). Although a plaintiff ordinarily-must submit at least one meaningful application which is denied to meet the finality requirement, *see, e.g., Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1454–55 (9th Cir.1987) (citing *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 351 n. 8, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986)), "litigants are not required to [engage in] futile gestures to establish ripeness." *Sammon v. New Jersey Bd. of Med. Examiners,* 66 F.3d 639, 643 (3d Cir.1995); *see Southview Assocs.,* 980 F.2d at 98–99 & n. 8 (citing *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1012 n. 3, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Honess 52 Corp. v. Town of Fishkill,* 1 F.Supp.2d 294, 301 (S.D.N.Y.1998)). The finality requirement can be fulfilled by showing that "[a]ny further efforts to work within administrative apparatus would be an exercise in futility." *Easter Seal of Society of New Jersey v. Township of North Bergen,* 798 F.Supp. 228, 236 (D.N.J.1992); *see Doe v. Butler,* 892 F.2d 315, 322 (3d Cir.1989).

In this case, it is uncontested that the plaintiff had submitted a fully conforming application as of February 9, 1998. The Town Board, by enacting the Local Law, effectively denied Sunrise's application for a special use permit, and significantly changed the standards and procedures governing Sunrise's attempt to obtain approval to build its CCF. The court finds that this decision is final because the Town has made it clear that it

will not willingly "grandfather" Sunrise's application under the old law and, therefore, the Board has taken final, definitive action that prevents the issuance of a special use permit to Sunrise.

As to actual, concrete injury, the passage of the new Local Law means that Sunrise will be forced to begin the application process anew to seek a zoning change. All the time, legal fees, and other expenses incurred in connection with the application for a special use permit have therefore been lost, and Sunrise will be required to face significant additional delay and expense. Depending on the length of the delay, Sunrise could lose its right to purchase the subject property, thus preventing it from building its CCF altogether and causing it to lose the more than $200,000 invested to date in the property's development as a CCF. Indeed, this prospect appears imminent given that even a grandfathered application took more than eight months after the Local Law's enactment to gain BZA approval, see Noone Aff. ¶ 9 n. 1, and the plaintiffs' options on the property expire in less than half that time. Further, Sunrise cannot meet the Local Law's new requirements without modifications to its plans for the CCF. These are all actual, concrete injuries that flow from the allegedly discriminatory conduct of the defendants and are therefore sufficient to establish finality.

Although it is true that Sunrise may apply to the Town for a zoning change which would enable Sunrise to build its CCF, and may ultimately receive permission to build its CCF, such action by the Town would not eradicate the above injuries. The project will have encountered delays and incurred expenses that it would not have had to face but for the allegedly discriminatory conduct of the defendants. If the defendants' conduct is found to be discriminatory, the plaintiffs would be entitled to a judgment against the defendants for the injuries suffered as a result of such conduct regardless of whether the Town ultimately permits the CCF to be built.

As to the hardship to the parties if court consideration is withheld, each day that passes while the project is delayed means delay for the plaintiffs in obtaining the housing the CCF would afford. Moreover, delay could prevent the project from being built and thus cause the loss of a considerable financial investment to date. By contrast, there is nothing to be gained by withholding judicial consideration of this controversy. The allegedly discriminatory conduct has already occurred and its effects are known. The court therefore concludes that the plaintiffs will suffer hardship if the court does not promptly adjudicate this controversy.

Accordingly, because the Town's enactment of the new Local Law is tantamount to a final denial of the special use permit that has caused actual, concrete injury to the plaintiffs, and because the plaintiffs are likely to suffer substantial hardship if judicial consideration of this controversy is withheld, the court finds the defendants' conduct at issue here to be ripe for adjudication. Therefore, the undersigned reports and recommends that the defendants' motion to dismiss the federal claims be denied.

### B. Standing for the SEQRA Claim

■ The defendants argue that the plaintiffs lack standing to assert their SEQRA claim and move to dismiss it on these grounds. The plaintiffs do not oppose this motion. The New York courts have determined that:

> to qualify for standing to raise a SEQRA challenge, a party must demonstrate (1) an injury in fact, i.e., an injury that is different from that of the public at large, and (2) that the alleged injury falls within the zone of interest sought to be promoted or protected by the statute.

*Stephens v. Gordon,* 202 A.D.2d 437, 438, 610 N.Y.S.2d 531, 532 (2d Dep't 1994); *see Duke & Benedict, Inc. v. Town of Southeast,* 253 A.D.2d 877, 678 N.Y.S.2d 343, 344 (2d Dep't 1998). To show an injury in fact,

a party seeking review under SEQRA "must specifically allege facts which demonstrate some 'special injury' beyond their bare identities as voters, taxpayers, ratepayers, property owners, residents or citizens concerned about or involved in public affairs." *Montecalvo v. City of Utica,* 170 Misc.2d 107, 116, 647 N.Y.S.2d 445, 452 (Oneida Sup.Ct.1996) (citing *Society of the Plastics Indus. v. County of Suffolk,* 77 N.Y.2d 761, 778, 573 N.E.2d 1034, 1044, 570 N.Y.S.2d 778, 788 (1991)). To meet the second requirement, the plaintiff must show that the alleged injury is at least in part a "noneconomic environmental concern." *McGrath v. Town Bd. of North Greenbush,* 254 A.D.2d 614, 678 N.Y.S.2d 834, 836 (3d Dep't 1998). Finally, "[t]he burden of establishing standing to raise [a SEQRA] claim is on the party seeking review." *Society of the Plastics Indus.,* 77 N.Y.2d. at 769, 573 N.E.2d at 1038, 570 N.Y.S.2d at 782.

The plaintiffs have not established, nor have they attempted to establish their standing to seek review under SEQRA and, therefore, they have failed to meet their burden. Moreover, the court's independent review of the facts presented here raises some questions as to whether the plaintiffs could meet their burden. The plaintiffs' alleged injuries do not appear to differ from those suffered by any hopeful owner of property zoned R–40. In addition, the alleged injuries do not appear to be "environmental" in nature. Because the plaintiffs are seeking review under SEQRA and have not established their standing to do so, the undersigned reports and recommends that the motion to dismiss the SEQRA claim be granted.

### C. Jurisdiction for the Supplemental Claims

Where a court has subject matter jurisdiction based on a federal statute, it may exercise supplemental jurisdiction over related state law claims. *See* 28 U.S.C. § 1367. Because the court reports and recommends against dismissal of the federal FHA and ADA claims, it reports and recommends that, with the exception of the SEQRA claim, the motion to dismiss the supplemental state law claims be denied. With respect to the SEQRA claim, however, the undersigned reports and recommends that the motion to dismiss be granted.

### II. PRELIMINARY INJUNCTION

■ As an initial matter, the court notes that the plaintiffs seek to preserve the status of the parties prior to the contested enactment of the Local Law. Accordingly, the preliminary injunction sought is prohibitory, rather than mandatory, in nature, because the plaintiffs seek to "maintain the status quo ante pending a full hearing on the merits." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). The " 'status quo to be preserved by a [prohibitory] preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy.' " *LaRouche v. Kezer,* 20 F.3d 68, 74 n. 7 (2d Cir.1994) (quoting Black's Law Dictionary 1410 (6th ed.1990)). Generally, a party seeking a prohibitory preliminary injunction must demonstrate (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *See Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 42–43 (2d Cir. 1997); *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995); *Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991); *Abdul Wali,* 754 F.2d at 1025.

Where the plaintiff alleges a violation of the ADA or of the FHA, however, some courts have found that a rebuttable presumption of irreparable harm arises if the plaintiff makes a substantial showing of the likelihood of success on the merits of its underlying claims. *See Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir.1984); *Stewart B. McKin-*

ney Found. v. Town Plan and Zoning Comm'n, 790 F.Supp. 1197, 1208 (D.Conn. 1992); Bronson v. Crestwood Lake Section 1 Holding Corp., 724 F.Supp. 148, 153 (S.D.N.Y.1989); see also Oxford House, Inc. v. City of Albany, 819 F.Supp. 1168, 1173 (N.D.N.Y.1993) (citing Gresham with approval); Innovative Health Sys., Inc. v. City of White Plains, 931 F.Supp. 222, 241 (S.D.N.Y.1996) (discussing but not applying Gresham where plaintiff made showing of irreparable harm independent of substantial likelihood of success on merits); Laurenti v. Water's Edge Habitat, Inc., 837 F.Supp. 507, 509 (E.D.N.Y.1993) (same). A "substantial showing" requires that the plaintiff meet the second prong of the preliminary injunction test, that of likelihood of success on the merits. See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979); City of Albany, 819 F.Supp. at 1173 n. 2; see also Gresham, 730 F.2d at 1423. Under Gresham then, the discrimination itself is presumed to cause irreparable harm to its victim. See Gresham, 730 F.2d at 1423. This presumption of irreparable harm may be rebutted "if the defendant can show that ... the violation won't occur." City of Albany, 819 F.Supp. at 1173 n. 2; see Stewart B. McKinney Found., 790 F.Supp. at 1208; see also Gresham, 730 F.2d at 1423. Finally, although the parties appear to agree that Gresham applies here, the Second Circuit has not yet adopted that view. For this reason, the court analyzes the plaintiffs' motion under both the Gresham holding and the generally applicable preliminary injunction standards.

A. Substantial Likelihood of Success on the Merits

1) The Applicable Law

■ Both the FHA and the ADA prohibit discrimination in housing based upon an individual's "handicap" or "disability," respectively. 42 U.S.C. § 3604(f)(1)(FHA); 42 U.S.C. § 12132(ADA). A plaintiff can establish a violation of the FHA or the ADA by proving that the challenged act was intentionally discriminatory or by proving that the challenged act has a disparate impact on the disabled. See Huntington Branch NAACP v. Town of Huntington, 844 F.2d 926, 933 (2d Cir.), aff'd, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (FHA); Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir.1998) (acknowledging disparate treatment and impact under the ADA). Specifically, under the FHA, a claim for disparate treatment arises where defendants "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). Similarly, the ADA provides that:

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Zoning is "service" within the meaning of the ADA. Innovative Health Sys., 117 F.3d at 44.

■ In addition, a plaintiff may establish a violation of the FHA, by proving that the defendant failed to make a reasonable accommodation that would enable the disabled to enjoy the same services and benefits as the able-bodied. See Oxford House, Inc. v. Town of Babylon, 819 F.Supp. 1179, 1182 (E.D.N.Y.1993). The parties do not seriously dispute that the John Doe plaintiffs are handicapped or disabled and that Sunrise may assert their rights under both the FHA and the ADA.[6]

---

**6.** In their December 7, 1998 correspondence, submitted without leave to the undersigned, the defendants for the first time assert that "there is no evidence in the record that all or the vast majority of the residents of the [CCF] are in fact handicapped." Mastaglio Ltr. at 3.

The court notes that the plaintiffs have submitted affidavits and exhibits which tend to support their assertion that the future residents are handicapped, see Noone Aff. ¶¶ 6–8; Ex. B, and that the defendants have offered no evidence to the contrary. In addition, a

Nor is there any dispute that both statutes apply to the facts presented by the instant action. The crux of the dispute here is whether the enactment of the Local Law was discriminatory.

### 2) Discriminatory Intent

The court finds the Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corporation* to be instructive on the issue of discriminatory intent. 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In *Arlington Heights,* the Court addressed the issue of whether the developer of racially integrated low and moderate income housing was the victim of invidious discrimination. *Id.* The Court identified the "[s]ubjects of proper inquiry" to determine whether a particular action was undertaken with discriminatory intent. *Id.* at 266, 97 S.Ct. 555. Among the factors to be considered are (1) the discriminatory impact of the action, (2) the historical background of the action, (3) the sequence of events leading up to the challenged action, (4) departures from normal procedural sequences, and (5) departures from normal substantive criteria. *Id.* at 266–68, 97 S.Ct. 555; *see LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir.1995) (applying *Arlington* factors to determine discriminatory intent in FHA claim); *First Ebenezer Baptist Church v. Consolidated Edison Co. of New York,* 974 F.Supp. 283, 287 (S.D.N.Y.1997); *Stewart B. McKinney Found.,* 790 F.Supp. at 1211. A plaintiff need not prove that discrimination was the *sole* motivating factor in the challenged act; rather, a plaintiff need only show that discrimination was *a* motivating factor. *See, e.g., Arlington Heights,* 429 U.S. at 265–66, 97 S.Ct. 555.

In this case, the Local Law discriminates on its face against CCF housing for the disabled in two ways. First, by its terms, the Local Law requires only CCFs to seek a zoning change and, therefore, it will be more difficult for the disabled residents of the CCF to live in the residential neighborhood of their choice. The imposition of requirements which make it more difficult for the disabled to live where they choose is discriminatory. *See, e.g., Stewart B. McKinney Found.,* 790 F.Supp. at 1209. Other uses which presumably would be equally offensive to the residential character of the neighborhood, such as radio beacons, radio and television broadcast stations, private nursery schools, and institutions of higher learning, need not apply for a zoning change and may still build their facilities in R–40 zoning districts upon the issuance of a special use permit. See Noone Reply Aff. ¶ 12. The court finds that the discriminatory impact of the Local Law causes the first *Arlington* factor to weigh in the plaintiffs' favor.

As to the historical background of the enactment of the Local Law, the court finds that this factor also weighs in favor of the plaintiffs. According to the defendants, the Local Law merely mirrors the zoning law in place prior to 1991 which addressed senior housing. They offer very little in the way of an explanation, however, for the sudden reversion to that law after more than seven years. The Town simply asserts its desire to comply with the Comprehensive Plan as the reason for the Local Law's enactment without pointing to a single reason to support the expedited passage of the Local Law some five years after the plan's effective date. More importantly, nearly sixteen months before the enactment of the Local Law, the Town formed the CAC to study CCFs, nursing homes, sanatoriums, and convalescent homes on Deer Park Avenue and to make

survey of the relevant case law indicates that the residents of CCFs and similar facilities are routinely found to be handicapped or disabled within the meaning of the FHA and the ADA, respectively. *See, e.g., Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096 (3d Cir.1996) (nursing home residents); *Easter Seal Society,* 798 F.Supp. 228 (D.N.J.1992) (recovering drug abusers); *Town of Babylon,* 819 F.Supp. 1179 (recovering alcoholics); *Stewart B. McKinney Found.,* 790 F.Supp. 1197 (HIV-infected persons).

recommendations to the Town regarding future development. Although the CAC recommended only limited regulation of senior housing, the Town disregarded the CAC's recommendations when it enacted the Local Law and completely disallowed all CCFs in all zoning districts except R–RM. The historical background of the Local Law is at odds with the notion that it was enacted for nondiscriminatory reasons.

The sequence of events leading up to the Town's enactment of the Local Law also indicates that discrimination likely played a role in its decision. First, the neighborhood association was openly hostile to the proposed CCF and adamantly expressed its opposition. Second, although the defendants dispute it, the plaintiffs contend that it was the Town which requested the adjournments of the public hearing on the plaintiffs' special use permit application in an effort to prevent the ultimate grandfathering of its application. Third, the Town disregarded its own CAC's recommendations for future development on Deer Park Avenue. Fourth, at the public hearing where the Local Law was enacted, the local residents were quite vocal in their opposition to the CCF and, as the plaintiffs point out, expressed views which embraced stereotypical notions about the disabled, including the view that their presence lowers property values and drains community services. Others criticized the "appearance and activity" of CCFs, asserting that a CCF would "alter the residential character" of the community. Tr. at 47:10–14. As one district court noted, "[a] discriminatory act would be no less illegal simply because it enjoys broad public support." *Association of Relatives and Friends of AIDS Patients v. Regulations and Permits Admin.*, 740 F.Supp. 95, 105 (D.P.R. 1990); *see Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555 (legislative history is "highly relevant where there are contemporary statements by members of the ... decisionmaking body"). Moreover, as the Second Circuit has made clear, "a decision made in the context of strong, discrimina-

tory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys.*, 117 F.3d at 49. The events leading up to the enactment of the Local Law lead the court to conclude that the defendants likely were swayed by the anti-disabled animus present in the community. Accordingly, the third factor weighs in favor of a finding of discriminatory intent.

An analysis of the fourth factor also results in a finding that it is likely that discrimination played a role in the Town's decision. Had the Town's normal procedure been employed following the March 3, 1998 passage of the Local Law, the Law would have taken effect on April 3, 1998, the day *after* the public hearing on the plaintiffs' application was to be held. Since the Law grandfathered any applications on which a public hearing had been held, the plaintiffs' application would have survived under the old law. The Town Supervisor deviated from normal procedural sequences, however, and certified the need for an immediate effective date. By doing so, he caused the Local Law to take effect prior to the public hearing on the Sunrise application scheduled for April 2, 1998, and thus prevented consideration of Sunrise's application under the old law. As one district court noted:

> A sudden and dramatic change to an existing zoning ordinance in response to a particular land-use application in a hasty effort to conform local zoning law to so-called fundamental Township land-use policies bespeaks pretext.

*Assisted Living Assoc. of Moorestown v. Moorestown Township*, 996 F.Supp. 409, 436 (D.N.J.1998); *cf. Kennedy Park Homes Assn. v. City of Lackawanna*, 436 F.2d 108 (2d Cir.1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) (sudden moratorium on subdivisions imposed by town on learning of planned integrated housing evinces discrimination), *cited in Arlington Heights*, 429 U.S. at

267, 97 S.Ct. 555. The Town has yet to identify any emergency or other circumstance that required it to accelerate the effective date of the Local Law. Accordingly, the court finds the fourth factor weighs heavily in favor of a finding of discrimination.

Finally, the fifth factor weighs in favor of the plaintiffs. The defendants appear to have given little or no consideration to "normal substantive criteria" when it enacted the Local Law. The hearing transcript is devoid of substantive reason for the Local Law. Although the Town did commission the CAC to undertake a study and issue recommendations on senior housing, when the time came to enact the Local Law, the Town disregarded the CAC's recommendations. It is also reasonable to assume that before limiting construction of a particular housing type, a town would attempt to ascertain the needs of the town for that housing. The Town does not, however, offer any evidence that its supply of future CCF units is sufficient to meet the demand for such units. In fact, it appears that the Town made no effort to ascertain this information. Instead, the Town merely limited the number of CCFs that could be built thus limiting the available housing for the disabled. As with the other factors, the court finds that the Town's actions evince discrimination under the fifth factor.

On the basis of the above analysis of the *Arlington* factors, the court concludes that the plaintiffs have established a substantial likelihood that discrimination played a central role in the Town's decision to enact the Local Law, and therefore have demonstrated a substantial likelihood of success on the merits of their FHA and ADA claims.

3) Disparate Impact

■ To establish a prima facie case of discrimination based on a disparate impact theory, the FHA or ADA plaintiff must show that " 'the challenged practice of the defendant actually or predictably results in

... discrimination.' " *Salute v. Stratford Greens Garden Apts.*, 136 F.3d 293, 302 (2d Cir.1998) (citing *Huntington Branch, NAACP*, 844 F.2d at 933). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to " 'prove that its actions furthered, in theory and in practice, a legitimate, bona fide ... interest and that no alternative would serve that interest with less discriminatory effect.' " *Id.*

■ The plaintiffs have stated a prima facie case of disparate impact discrimination. The Local Law defines "Congregate Care, Life Care and Assisted Living Facilities" as "residential developments providing dwelling units for person at least sixty-five (65) years old" which must include an "association with a fully licensed nursing home facility which provides skilled care to residents requiring such services on a priority basis." Town Law §§ 198–2; 198–2(1). As discussed in connection with the first *Arlington* factor, by the terms of the Local Law only CCFs are required to apply for a zoning change, rather than a special use permit, thereby making it more difficult for the disabled than the able-bodied elderly to obtain approval for the construction of housing suited to their needs in residential neighborhoods. On its face, it appears very likely that the Local Law will have a disparate impact on disabled persons.

The Town has not, however, met its burden to come forward with a "legitimate, bona fide" reason for its enactment of the Local Law. The Town states only that the Local Law was enacted to comply with the Comprehensive Plan, a reason which, as discussed, the court finds questionable in light of the Local Law's hasty passage nearly five years after the Comprehensive Plan's effective date. Moreover, the Town has not offered evidence to support a finding that no less discriminatory alternative to the Local Law would serve the Town's interest in complying with the Comprehensive Plan. The court finds, therefore, that it is likely that the plaintiffs will prevail on

their FHA and ADA claims on the grounds of disparate impact as well as intentional discrimination.

#### 4) Reasonable Accommodation

■ The FHA provides that discrimination occurs when there is a "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to enjoy such dwelling." 42 U.S.C. § 3604(f)(3)(B). A reasonable accommodation is a slackening of the requirements imposed on the able-bodied to make it easier for the disabled to enjoy the same benefits as the able-bodied. *Oxford House, Inc. v. Cherry Hill,* 799 F.Supp. 450, 462 n. 25 (D.N.J.1992). Thus, a defendant can be required to accommodate a plaintiff's disability, "provided such accommodations do not pose an undue hardship or substantial burden" on the defendant. *Salute,* 136 F.3d at 300.

The parties agree that the Town must make reasonable accommodations necessary to afford persons with disabilities equal opportunity to use or enjoy a dwelling. The parties also appear to agree that zoning is such a "rule" that may require modification to permit such equal housing opportunities. The dispute here centers on what reasonable accommodation is required.

■ Sunrise made two written requests that the Town reasonably accommodate it by grandfathering its application under the old law which the Town has refused to do. See Machtay Aff.Exs. Q, R. In essence, Sunrise is asking that it be permitted to apply for a special use permit in the R–40 zoning district and thus be placed on the same footing as the numerous other uses which enjoy the right to make a special use permit application for uses within that district. Sunrise contends that absent this accommodation, its CCF will not be built and the John Doe plaintiffs will be deprived of the right to live in the R–40 zoning district, a right enjoyed by able-bodied Town citizens. The Town counters that Sunrise has not given it an opportunity to make an accommodation because Sunrise has not applied for a zoning change as required by the Local Law.

The Town misconstrues the reasonable accommodation requirement. For the Town to insist that a zoning change, if granted, constitutes a reasonable accommodation turns the reasonable accommodation requirement "on its head." *Cherry Hill,* 799 F.Supp. at 462 n. 25. Here, the Town is imposing more onerous requirements on the disabled, and *only* the disabled, that of applying for a zoning change instead of applying for a special use permit. A reasonable accommodation would lessen, not increase, the requirements imposed on the disabled. The Town has offered no explanation for its refusal and does not claim that the accommodation requested is unduly burdensome or that it imposes a substantial hardship. Therefore, the court is persuaded that the plaintiffs have demonstrated a substantial likelihood of success on the merits on their claim that permitting the Sunrise application for a special use permit to proceed is a reasonable accommodation to permit the disabled future residents of the Sunrise CCF the opportunity to reside in the R–40 zoning district, just as the able-bodied residents of the Town may so choose.

Under the *Gresham* view, then, because the plaintiffs have established a substantial likelihood of success on the merits of both their FHA and ADA claims, they have also established irreparable harm thus entitling them to a preliminary injunction. As discussed, however, the Second Circuit has not yet adopted the *Gresham* holding and therefore, the court undertakes a separate analysis of whether the plaintiffs have established irreparable harm, independent of the finding that the plaintiffs have established a substantial likelihood of success on the merits.

#### B. Irreparable Harm

■ The plaintiffs make two arguments that they face irreparable harm.

First, Sunrise contends that it will be "deprived of its right to provide housing for the elderly and individuals with disabilities, a right expressly secured by § 3604(f) of the Fair Housing Act." Pl.Mem. at 20. The defendants counter that Sunrise never had a vested right to build its CCF and that, in any event, Sunrise will be permitted to build the CCF should it apply for and receive a zoning change for its site.

While to "make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter" is unlawful under the FHA, the act does not expressly provide a right to a special use permit simply because the future residents of the intended structure will be disabled. 42 U.S.C. § 3604(f)(1); *see Oxford House, Inc. v. City of Virginia Beach,* 825 F.Supp. 1251, 1261 (E.D.Va.1993) (no "blanket waiver" of zoning regulations for disabled). Rather, the FHA seeks to place the disabled on the same footing as the able-bodied in their quest for suitable housing. *See, e.g., Bryant Woods Inn v. Howard County,* 124 F.3d 597, 603–604 (4th Cir. 1997). A developer has no vested right to use his land in a particular manner until he begins to build on that land, *see, e.g., Downey v. Village of Ardsley,* 3 A.D.2d 663, 158 N.Y.S.2d 306 (2d Dep't 1957), and "it is well-settled that entitlement to a special permit is not a matter of right and compliance with ordinance standards must be shown before a special permit can be granted." *L & M Realty v. Village of Millbrook Planning Bd.,* 207 A.D.2d 346, 347, 615 N.Y.S.2d 434, 436 (2d Dep't 1994); *see Tandem Holding Corp. v. Board of Zoning Appeals of Town of Hempstead,* 43 N.Y.2d 801, 802, 373 N.E.2d 282, 402 N.Y.S.2d 388 (1977). Accordingly, the court finds Sunrise's argument that it is being deprived of a "right to provide housing" unavailing and, therefore, that the plaintiff Sunrise has not established that it will suffer irreparable harm should the preliminary injunction not issue.

The plaintiffs' second contention fares better. Sunrise also contends that the John Doe plaintiffs will be "[m]ost seriously harmed . . . [g]iven the already substantial shortage of facilities for elders and individuals with disabilities in the Town. . . these plaintiffs will be required to wait indefinitely for the construction of facilities which meet their needs." *Id.* Sunrise avers that it conducted a market study which supports its statement that there is a "substantial shortage of [CCF] facilities" in the Town. Noone Aff. ¶ 12. The defendants counter that there are more than 773 assisted living facility units now existing in the Town with another 487 units pending Town approval, and therefore the John Doe plaintiffs are not being deprived of suitable housing. The Town concedes that it conducted no studies, however, to determine whether this supply of housing is sufficient to meet the needs of the Town's disabled elderly.

The court finds that the John Doe plaintiffs will be irreparably harmed absent the grant of a preliminary injunction because, for the period of the delay occasioned by the reapplication process, they will be unable to live in the residential neighborhood of their choice, while the able-bodied citizens of the Town are free to make that choice. Although other housing for the disabled may be available within the Town's borders, that housing is not located in this particular residential neighborhood, which the court surmises is a more desirable location than the other housing for the disabled planned in the Town. Further, the Town has offered no substantive evidence to show that the presently planned housing will be sufficient to meet the needs of the Town's disabled population. As the *Gresham* court noted, "a person who is discriminated against in the search for housing cannot remain in limbo while a Court resolves the matter." 730 F.2d at 1424. Further, even if Sunrise ultimately prevails on the merits of its claims, if the matter is not resolved by the April 2, 1999 expiration of the plaintiffs' options on the property, the victory will be a hollow one because the Town will still have prevented

the development of the Sunrise CCF. And, even if the Sunrise CCF can ultimately be built, for each day that its construction is delayed, the John Doe plaintiffs will suffer the irreparable harm associated with disability discrimination and the correlative stigma which attaches to its victims. *See Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 336 (2d Cir.1995).

Accordingly, even under the traditional preliminary injunction standards presently utilized by the Second Circuit, the plaintiffs have met their burden to show that they will experience irreparable harm absent the grant of a preliminary injunction and that there is a substantial likelihood of success on the merits of their claims. Therefore, the undersigned reports and recommends that the plaintiffs' motion for a preliminary injunction be granted.

### C. Scope of the Preliminary Injunction

The plaintiffs at oral argument clarified the scope of the preliminary injunction they seek. Specifically, to preserve the status quo ante, they ask that the court require the BZA to complete its review of Sunrise's application for a special use permit under the old law and to hold the required public hearing, but to stop short of rendering a final decision on the application. The reason for permitting the BZA to withhold final decision, however, was not articulated, and the court perceives no advantage to that procedure. Indeed, it appears that withholding decision now could provide an opportunity for further delay if the plaintiffs prevail on the merits; because the BZA would then have to place the matter on its agenda and reacquaint itself with the issues before rendering a decision. Accordingly, the undersigned magistrate judge recommends that a preliminary injunction issue requiring the Town (i) to reinstate the plaintiffs' application to the BZA calendar, (ii) to schedule a public hearing on it as soon as is feasible, and (iii) to render a decision on the plaintiffs' application for a special use permit under the law that existed prior to March

3, 1998. The undersigned further recommends that the BZA's decision on the application be published to the parties but that the district court expressly order that the decision not be considered "final and binding" upon the plaintiffs, for purposes of triggering limitations of time applicable to commencement of an Article 78 proceeding under New York Law, until the district court renders a final decision in this action. *See* N.Y.C.P.L.R. 217.

### III. ATTORNEYS' FEES

■ The plaintiffs also seek an award of attorneys' fees, incurred in connection with its motion for a preliminary injunction, pursuant to title 42, section 1988 of the United States Code. The plaintiffs do not, however, address this issue beyond simply stating that they seek such an award. The award of section 1988 attorneys' fees is entirely within the court's discretion, *see, e.g., LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748, 756 (2d Cir.1998), and is most often granted at the preliminary injunction stage only "where the preliminary relief has in practical effect been a final determination of the merits." *Davidson v. Scully,* No. 83 Civ.2025, 1994 WL 669549, at *19 (S.D.N.Y. Nov.30, 1994) (citing *Dahlem v. Board of Educ. of Denver,* 901 F.2d 1508, 1511–14 (10th Cir. 1990)). Here, because the relief the court recommends can in no way be considered a final determination on the merits and because the plaintiffs have not provided support for their application, the court concludes that such an award is premature at this juncture. Accordingly, the undersigned reports and recommends that the plaintiffs' application for attorneys' fees be denied with leave to renew when the merits are finally determined.

### CONCLUSION

In sum, the undersigned REPORTS and RECOMMENDS that the defendants' motion to dismiss the federal claims on the grounds of ripeness be DENIED; but that the motion to dismiss the SEQRA claim on the grounds of standing be GRANTED. Further, because the plaintiffs have dem-

onstrated a substantial likelihood of success on the merits of their claims, and that they will suffer irreparable harm absent the grant of the preliminary injunction, the undersigned REPORTS and RECOMMENDS that the plaintiffs' motion for a preliminary injunction be GRANTED. Finally, the undersigned REPORTS AND RECOMMENDS that the plaintiffs' application for attorneys' fees be DENIED with leave to renew upon a final determination of the merits.

\* \* \* \* \* \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court with a copy to the undersigned within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *IUE AFL—CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

January 7, 1999.