WOODFIELD EQUITIES, L.L.C., Crossings Recovery Systems, Inc. d/b/a Crossing Recovery Centers, Crossing Recovery Residents, Inc., Crossings Addiction Management, Inc. and "John Does" and "Jane Does" No. 1 through No. 50, Plaintiff(s),

v.

The INCORPORATED VILLAGE OF PATCHOGUE, The Board of Trustees of The Village of Patchogue, Paul J. Pontieri, Jr., individually and in his official capacity as Mayor and Member of the Board of Trustees, Joseph E. Perry, individually and in his official capacity as Deputy Mayor and Member of the Board of Trustees, Peter Sarich, individually and in his official capacity as Senior Building Inspector, James M. Nudo, individually and in his official capacity as Building Inspector, Gerard J. Crean, Joseph P. Dean, John A. Krieger, Stephen J. McGiff, and Patricia M. Seal, individually and in their official capacities as Members of the Board of Trustees,

---

and "John Does" and "Jane Does" No. 1 through No. 10, who are Village of Patchogue Employees whose identities are not yet known and who are more particularly described in the complaint, Defendant(s).

No. CV–04–5116.

United States District Court,
E.D. New York.

Feb. 24, 2005.

Edward Michael Ross, Rosenberg Calica & Birney LLP, Judah Serfaty, Rosenberg Calica & Birney LLP, Garden City, NY, J. Timothy Shea, Jr., Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP, Melville, NY, for Plaintiffs.

Stanley A. Camhi, Jaspan, Schlesinger & Hoffman, LLP, Garden City, NY, for Defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Corporate plaintiffs Woodfield Equities L.L.C., et al., and resident plaintiffs, "John Does" and "Jane Does" Nos. 1–50 (collectively "Plaintiffs"), urge this Court to grant a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants Village of Patchogue, et al. (hereinafter "Village"), from acquiring Plaintiffs' property at 380 and 390 Bay Avenue, Patchogue, New York, for a public purpose use, through the exercise of eminent domain.

For the following reasons, Plaintiffs' request for a preliminary injunction is **DENIED**.

### Background

The Court held a preliminary injunction hearing from December 6 through December 15, 2004. Several witnesses testified, including Defendant Paul Pontieri, the Mayor of the Village of Patchogue. Both parties introduced a large quantity of documentary evidence, including a satellite photograph of the Village of Patchogue. Plaintiffs' design was to demonstrate to this Court that the Village's decision to acquire the Plaintiffs' properties by emi-

nent domain amounted to intentional discrimination under the criteria articulated by the Supreme Court in *Arlington Heights v. Metro. Housing. Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

As this Court stated at the outset of this controversy, this Court should abstain from all aspects of this case except the grant or denial of the preliminary injunction. A lengthy hearing was conducted in order to determine whether there was any basis for the assertion that the condemnation proceedings were pre-textual and discriminatory. After the hearing, it was clear to this Court that there was none.

In short, the Plaintiffs are not in compliance with the Village's zoning laws despite having adequate opportunity to do so. The Plaintiffs refused to make any application of any kind to the Board of Zoning Appeals. Mr. Buonanotte, the President and CEO of Woodfield Equities, L.L.C., et al., never testified as to the reason for this failure and refusal to do so, despite the fact that he was present each day at the hearing and had an adequate opportunity to do so.

Moreover, New York State has a complete and comprehensive condemnation procedure in which the State courts are given the task of ensuring that condemnation procedures are in accord with State and Federal constitutional law. This Court should not be called upon to, and should not, act as the Village's Board of Zoning Appeals or as a substitute for the Village Board of Trustees.

Although this Court is not convinced the *Arlington Heights* analysis applies to the present case, for reasons discussed *infra,* Plaintiffs are correct that a review of whether intentional discrimination was a motivating factor behind the Village's actions "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington*

*Heights,* 429 U.S. at 266, 97 S.Ct. 555. With that charge in mind, what follows is a detailed description of the individuals and properties involved, and a recalling of the events which led to the Plaintiffs' application for a preliminary injunction.

## A. The Parties

a. The corporate Plaintiffs are a group of for-profit corporations owned by Mr. Frank Buonanotte. (Buonanotte Decl. ¶ 1) The properties located at 380 and 390 Bay Avenue, Village of Patchogue, New York ("the Premises") comprise the principal place of business for plaintiff Woodfield Equities, L.L.C. ("Woodfield")(*Id.*) Plaintiff Crossings Recovery Residents, Inc. ("Crossings Residents") leases the Premises from Woodfield. (Tr. 101) Crossings Residents utilizes the Premises as a residence for its clients who are recovering alcohol and drug addicts receiving treatment at its duly licensed, off-site clinic, Crossings Recovery Center, Inc. ("Crossings Center") located in the Town of Brookhaven, New York. (Compl. ¶ 15; Tr. 31–33, 54) Five other outpatient clinics are located in Nassau and Suffolk Counties. (Compl. ¶ 11) Each clinic is licensed by the New York State Office of Alcoholism and Substance Abuse Services to treat alcoholism and other drug dependencies, and all are accredited by the Joint Commission on Accreditation of Healthcare Organizations. (*Id.*) Mr. Buonanotte is also the sole owner of Woodfield Manor Associates, L.L.C., located in West Hempstead, New York, and Woodfield Management, L.L.C., located in Brentwood, New York. These companies lease residential housing to clients of Mr. Buonanotte's multiple Crossings Center clinics. (Ex. 2)

The Residents are currently living at the Premises and paying rent in the amount of $450.00 per month to Crossings Residents. (Tr. 120) Clients of Crossings Residents

are licensees whose right to occupy a bed space survives as long as they remain clients of Crossings Centers and pay the monthly rent. (Tr. 102) All residents must sign and abide by the rules and regulations contained in the "Crossings Recovery Residence Participant License Agreement." (Ex. 7) During their stay, residents are required to take part in a regimented daily schedule which includes chores, house meetings, and random urine tests. (Tr. 162; Ex. 2)

b. The Village of Patchogue is located in Suffolk County, New York. The Village has approximately 11,500 residents, and occupies a space of about 2.2 square miles. (Tr. 244) Defendant Mr. Paul V. Pontieri, Jr. is the Mayor of the Village. (Tr. 224) The remaining individually named Defendants—Joseph E. Perry, Peter Sarich, James M. Nudo, Gerard J. Crean, Joseph P. Dean, John A. Krieger, Stephen J. McGiff and Patricia M. Seal—are either elected or appointed officials of the Village of Patchogue.

### B. The Premises

The backyards of 380 and 390 Bay Avenue are adjacent to the Shore Front Park Complex in the Village of Patchogue. (Tr. 473) The Shore Front Park complex has several baseball fields, basketball courts, and a soccer field. (Tr. 477) The Park also has a band shell for outdoor concerts. (Tr. 497)

The boundaries of the Village zoning map were established in 1953. (Patchogue Code § 93–3) The Premises are located within an area zoned as an A Residence District, consisting of single-family residences. (Ex. 27; Patchogue Code § 93–7(A)(1)) Since the 1970s, the previous owner, Mr. Reid Bielecki, used the large house located at 380 Bay Avenue—historically referred to as the "Halcyon Manor"—as a residence for senior citizens, in contravention of the zoning district requirement.

(Buonanotte Decl. ¶ 15; Tr. 265–66; Patchogue Code § 93–16.1(A)(1)(m)) Senior citizen residences are permitted in an RH Business District zone. (Patchogue Code § 93–10.1) The nonconforming use of the Halcyon Manor pre-dates the zoning code of 1953. (Tr. 236) Under Village law, "The lawful use of any building, structure or land existing at the effective date of an ordinance or local law which renders said use nonconforming may be continued although such use does not conform to the provisions of such ordinance or local law. . . ." (Patchogue Code § 93–59)

In addition to the Halcyon Manor, a cottage is located at 380 Bay Avenue, and a single family residence occupies the property at 390 Bay Avenue. (Buonanotte Decl. ¶ 16)

Mr. Buonanotte negotiated to purchase the Premises in the Spring of 2004. (Buonanotte Decl. ¶ 12) On August 27, 2004, Mr. Buonanotte purchased the Premises on behalf of Woodfield, for $1,200,000.00. (Exs. L, M) Mr. Buonanotte planned to house approximately 50 recovering alcoholics and drug addicts in the Halcyon Manor and another four residents in the cottage. (Buonanotte Decl. ¶ 16) In addition, Mr. Buonanotte envisioned housing up to nine residents in the house on the 390 Bay Avenue property. (Ex. 11)

The property at 400 Bay Avenue is adjacent to the Premises and is also the subject of the Village's eminent domain proceedings. The owner has publicly protested the Village's decision to condemn his property; however, he is not a party to this law suit.

### C. The Village's Proposed Public Purpose Use: Part One

Soon after his election in April 2004, Mayor Pontieri identified the need to relocate several Village organizations which he believed are currently housed in inad-

equate facilities. (Tr. 297–99) Mayor Pontieri was initially concerned with the condition of the Village's Four Sisters community center. (*Id.*) This community center provides recreational activities to the Village's senior citizens, and serves as a meeting place for other Village groups. (*Id.*) Four Sisters is currently located on a commercial thoroughfare and does not have an outdoor area for recreational use. (Tr. at 482; Exs. B15, B17) Among the laundry list of health and safety issues afflicting the current facility are asbestos, a leaking roof, mold on the ceilings, and bathrooms that are not handicap accessible. (Tr. 501–05) Mayor Pontieri also determined that the Village's Public Safety Office needed a new facility. (Tr. 501–02) The Public Safety Office is currently housed in a trailer located on a dirt lot, adjacent to the site where the Village sorts its garbage. (*Id.*) Photographs of the Public Safety Office show refuse strewn in front of the trailer. (Exs. B12, B13) Mayor Pontieri also determined that the site needed to be moved to a location which provided the Enforcement Officers with more visibility with the community it is tasked to serve. (Tr. 419, 503)

Mayor Pontieri is also a member of the Patchogue–Medford Youth and Community Services ("PMYCS") board of directors. The Mayor expressed concern about the substandard conditions of the PMYCS's current facility. The facility does not have an outdoor recreation area and shares a bathroom with other tenants in the building, which is a concern given the fact that the PMYCS members are children. (Tr. 514)

Additionally, the Mayor wished to find housing for other Village organizations, including the Historical Society and the Patchogue Little League, neither of which have permanent office space. (Tr. 422–23)

The Mayor testified that relocation of these agencies was his goal long before he took office. (Tr. 298) Concrete steps were taken to relocate these governmental units shortly after Mr. Pontieri became Mayor in April 2004. The Mayor hired an architect to create a plan for a new community center on a property closer to the Shore Front Park complex. (Tr. 391–92) The architect drafted a preliminary site plan which he submitted to the Village on August 26, 2004. (Tr. 554, 650; Ex. C) After reviewing the drafts, the Mayor and other Village officials decided that the plan was inadequate to meet the Village's requirements, primarily because the proposed 7,000 square foot facility was too small to house all of the groups and organizations the Village needed to re-locate. (Tr. 394)

At the same time Village officials reviewed the proposed relocation plan, Mayor Pontieri inquired about purchasing 380 and 390 Bay Avenue as a possible relocation site. (Tr. 368) Mr. Bielecki informed the Mayor that his property was not for sale, even though evidence revealed that at the time, Mr. Bielecki had already negotiated a contract for the sale of his property to Mr. Buonanotte. (Buonanotte Decl. ¶ 12) Mr. Bielecki also represented to Mayor Pontieri that he would not sell his property to anyone who wished to displace the residents then living in the Halcyon Manor. (Tr. 351, 368)

## D. The Plaintiffs and the Village Meet

Village authorities learned that the Plaintiffs took occupancy of the Premises when individual Defendant James Nudo, received an anonymous phone call that the Premises had changed ownership. (Tr. 666–67) Mr. Nudo visited the Premises shortly after Labor Day 2004 in his capacity as the Village's Code Compliance Officer. (*Id.*) Mr. Nudo testified that when he visited the Premises he met an unidentified person who told him that the new owner of the Premises was named

"Frank." (*Id.*) The unidentified person then gave a business card to Mr. Nudo which listed Mr. Frank Buonanotte as "CEO/President Crossings Recovery Systems, Inc." (Tr. 686; Ex. Q)

Individual Defendant Mr. Peter Sarich is the Village's Senior Building Inspector. (Ex. 9) He sent a letter dated September 7, 2004 to Mr. Buonanotte informing him that the Village did not have a certificate of occupancy on file for the 380 Bay Avenue property and that a certificate of occupancy was necessary before anyone could be housed in the Halcyon Manor. (*Id.*) The letter advised that Mr. Buonanotte should contact the Village's Building Department to arrange to comply with this requirement. (*Id.*)

Sometime during the middle of September—in what has proven to be a very significant meeting—Mr. Buonanotte and his attorney, J. Timothy Shea, Jr., met with Mayor Pontieri and the Village's Attorney, J. Lee Snead, Esq., to discuss Mr. Buonanotte's proposed use of the Premises. Mr. Buonanotte explained that he planned to use the Premises as a recovery center for alcohol and drug addicts. (Tr. 90–91, 96–97, 101, 122; Exs. 2, 7, 11, 28, 29) Mr. Buonanotte explained that he planned to expand Halcyon Manor from its current 30 resident capacity, to accommodate up to 50 residents. (Ex. 11)

At the conclusion of the meeting, the Parties verbally agreed to the following:

(i) Plaintiffs would seek a use variance for the 380 Bay Avenue property to permit the use of the premises for adults receiving treatment at the Crossings clinic in the Town of Brookhaven.

(ii) Plaintiffs would seek a rental permit for the 390 Bay Avenue property which only has a certificate of occupancy for a single family residence.

(iii) Plaintiffs would not move anyone into either residences other than the three residents and house manager already occupying the residence on 390 Bay Avenue, and in return, the Village would not take any action against the Plaintiffs. (Ex. 10)

At some point during or soon after this meeting—it is unclear from the record exactly when—Mayor Pontieri inquired as to whether the Plaintiffs would be willing to sell the Premises to the Village. (*Id.*) Mr. Buonanotte later offered to sell the Premises to the Village for $2.4 million, approximately twice the amount he paid for the property. (Tr. 555; Defs.' Mem. at 20)[1]

On September 28, 2004, Mr. Shea went to the Building Inspector's office in order to obtain a building permit application. (Ex. 10) Once there, Mr. Shea met Mr. Nudo, who informed him that he was preparing summonses for the Plaintiffs because they did not secure the Village's approval before converting the Premises. (*Id.*) Mr. Nudo did not issue the summonses until October 22, 2004. (Exs. 18, 36)[2]

Later that day, Mr. Shea sent a letter to the Village Attorney, recounting his meeting with Mr. Nudo and reminding Mr. Snead of the aforementioned agreement Mr. Bounonatte made with the Village. (Ex. 10) Mr. Shea also stated that the "use of the premises has not changed in any way" from the previous owner's use. (*Id.*) Finally, Mr. Shea stated that Mr. Buonanotte was still considering the offer to sell the Premises to the Village. (*Id.*)

On October 7, 2004, Mr. Shea sent a second letter to Mr. Snead. (Ex. 11) In

---

1. Both Plaintiffs and Defendants submitted pre- and post-hearing memoranda. Unless otherwise indicated, all cites to the Parties' memoranda refer to the post-hearing submissions.

2. These summonses are currently the subject of a state criminal proceeding, and as such this Court refrains from discussing their merits.

this letter, Mr. Shea makes reference to an October 7, 2004 local newspaper article in which Mr. Snead is quoted as saying that, "[Plaintiffs] can apply to the village board to have the lots changed to Business H District" because the Premises are located in a residential zone. (Ex. 32b) Mr. Shea expressed his concern that the Village was sending mixed signals, since at the Parties' meeting in September, Mr. Snead advised the Plaintiffs to apply to the Village's Board of Zoning Appeals for a use variance pursuant to Patchogue Code §§ 93–45, 93–54.(Id.)[3] Mr. Shea also makes reference in his letter to a proposed interim agreement in which additional residents could occupy the Premises until the Plaintiffs submitted and the Village determined whether to grant the use variances and rental permits.[4] (Ex. 11)

Mr. Snead responded to Mr. Shea on October 14, 2004. (Ex. 12) In his letter, Mr. Snead points out that he has no control over what the press reports and decides not to report, and reminds Mr. Shea that the Village is anticipating the Plaintiffs' submission of a "use variance application." (Id.) Mr. Snead also states that the Village Fire Marshal visited the Premises and learned that the four residents who had been living at 390 Bay Avenue moved into the Halcyon Manor, in violation of Mr. Buonanotte's promise. (Id.) Furthermore, he advises Mr. Shea that the Village is aware that renovations had been made to the Halcyon Manor without the benefit of

a building permit. (Id.) Mr. Snead reminded Mr. Shea that both actions violated the Village's code, specifically Patchogue Code §§ 93–4 and 93–44(A). (Id.)

Mr. Shea then responds on October 15, 2004, and asks for an explanation as to why the Plaintiffs needed the Village's authorization to occupy the Premises. (Ex. 13) He further protests the right of any Village official to set foot on the Premises. (Id.) Three days later Mr. Snead answered that the Plaintiffs had to apply for a use variance from either the Zoning Board of Appeals or the Village because the proposed use of the Premises is not the same as the previous owner's use. (Ex. 14)[5] Finally, two days later, Mr. Snead wrote to Mr. Shea that he was aware that bulk packages of what appeared to be food items were being delivered to the Premises, which he perceived as a signal that preparations were being made to move in additional residents. (Ex. 15)

### E. The Village's Proposed Public Purpose Use: Part Two

With no sign of receiving any application for a use variance request or rental permit from Mr. Buonanotte, by late October, Mayor Pontieri began to consider the impasse as a "unique opportunity" for the Village to acquire the Premises (and 400 Bay Avenue) through eminent domain. (Tr. at 617) The properties and buildings located thereon could be used by the Village to relocate the several governmental units needing new facilities. (Id.) Mayor

---

3. The October 7th article also states "[the] village has already indicated to Mr. Buonanotte that he must appear before the zoning board to apply for a change of zone before he can open his homes for use." (Ex. 32b).

4. Mr. Shea inexplicably ends this letter by informing Mr. Snead of the amount of attorney's fees awarded to plaintiffs in a recent Eastern District case involving a violation of the Fair Housing Act.

5. "The Board of Appeals shall hear and decide appeals from any … requirement … made by the Building Inspector or other official charged with the enforcement of this local law. Upon such appeal … the Board may vary or modify the application of any provision of this local law relating to … *use of land.* …" Patchogue Code Sect. 93–49(emphasis added).

Pontieri testified that "the opportunity was looked at and it was just felt the least disruptive to all if it was done at that time" because the Parties had agreed that there should not be any occupancy in the residences as Mr. Bunonatte had not yet made the proper applications. (Tr. 577–78) Moreover, the senior citizens who lived in the Halcyon Manor when it was owned by Mr. Bielecki, had since moved.

The Premises, plus the 400 Bay Avenue lot, are adjacent to the Shore Front Park complex. (Ex. D) According to Mayor Pontieri, this location, coupled with the relatively large office space afforded by the Halcyon Manor, would enable the Village to accomplish a great many initiatives. (Tr. 577–78) The Halcyon Manor and other structures on the three properties could house the Four Sisters, the Code Enforcement Office, the PMYCS, the Historical Society, the Village Band, and the Little League office. (Ex. D) Each organization could then utilize the park complex literally in their backyard for outdoor recreational activities, year round. (Tr. 497) Also, the existing soccer field could be expanded to regulation size, satisfying a request from the Village's growing Ecuadorian community. (Tr. 414, 476–77, 535–36)

F.   Condemnation Proceedings

Mayor Pontieri formally discussed with the Board of Trustees on October 25, 2004 the possibility of initiating condemnation proceedings. (Ex. 33) In accordance with New York State's Eminent Domain Procedure Law ("EDPL"), the Village held an Article 2 public meeting on November 15, 2004 in the Village Hall. (Ex. 19) In addition to publishing a notice of the meeting, the Village Attorney personally invited Plaintiffs' attorney to attend. (Defs.' Pre–Hr'g Mem. at 12–13) The Board of Trustees heard a presentation about the proposed condemnation. (*Id.*) Afterwards, members of the public—including the Plaintiffs—were given the opportunity to comment on the Village's proposal. (Tr. 587) The Board of Trustees then held the record open for four days to allow anyone to submit additional materials for their consideration. (*Id.*) Plaintiffs availed themselves of this opportunity and submitted a two page letter urging the Village Board to reconsider the condemnation. (Ex. 17)

On November 22, 2004, the Board of Trustees passed a resolution adopting its determination and findings approving the condemnation of the Premises and the property at 400 Bay Avenue. (Ex. I) The condemnation is not final, however, because under the EDPL any person or persons jointly or severally aggrieved by the municipality's condemnation proceedings may seek judicial review of the Village's determination in the Supreme Court of the State of New York, Appellate Division. (EDPL § 207(A))

Plaintiffs then filed a complaint with this Court on November 24, 2004. On November 30, 2004, Plaintiffs submitted a request for an Order to Show Cause and a Temporary Restraining Order ("TRO"), alleging that the Village's decision to condemn the Premises was "foreclosing (without judicial intervention) any 'reasonable accommodation' which is required, as a matter of law, under the Fair Housing Act, the Americans with Disabilities Act and the Rehabilitation Act." (Letter from Plaintiffs to J. Platt of 11/30/04, at 2) This Court denied the application for a TRO on December 2, 2004, and ordered a hearing on the preliminary injunction application.

**Applicable Statutes**

The Plaintiffs allege that when the Village's Board of Trustees took action to condemn the Premises, they violated the Fair Housing Act ("FHA"), the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act.

It is unlawful under the FHA "to discriminate in the sale or rental, or to other-

wise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). Moreover, "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling," also constitutes discrimination under this statute. *Id.* § 3604(f)(3)(B). The ADA and the Rehabilitation Act require that municipalities make reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from, or to participate in programs provided by, municipalities. *See Reg'l Econ. Cmty. Action Program v. City of Middletown,* 294 F.3d 35, 46 (2d Cir. 2002). The ADA prohibits a public entity from denying equal services to individuals because of their disabilities. *Discovery House, Inc. v. Consol. City of Indianapolis,* 319 F.3d 277, 279 (7th Cir.2003). The Rehabilitation Act provides that "no otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a). Finally, "[a]ll three statutes apply to municipal zoning decisions." *Reg'l Econ. Cmty. Action Program* 294 F.3d at 46, quoting *Forest City Daly Hous., Inc. v. Town of North Hempstead,* 175 F.3d 144, 151 (2d Cir.1999).

### Ripeness

█ Whether a matter is ripe for adjudication is a question of law. *Sunrise Dev., Inc. v. Town of Huntington,* 62 F.Supp.2d 762, 770 (E.D.N.Y.1999)(J. Pohorelsky). "[The ripeness doctrine's] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681, (1967), overruled on other grounds by *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Supreme Court held that two factors must be considered before deciding whether an issue is ripe for adjudication: i) "fitness of issues for judicial decision" and ii) the "hardship to the parties of withholding court consideration." *Id.* Whether a controversy is fit for a judicial decision is a question as to whether there has a been a final determination by a decision maker. *Id.*

Plaintiffs cite many cases in support of their application to this Court for injunctive relief. (Pls.' Pre–Hr'g Mem. at 2) [6] In general, these cases demonstrate that preliminary injunctive relief is warranted when a municipality is alleged to have discriminated against a residence for recovering alcohol and drug addicted persons by refusing to grant reasonable accommodations in response to the plaintiff's application for a use variance or special permit. Only *after* the applications were turned down by the municipalities for ostensibly discriminatory motives, did the District Courts take jurisdiction. *See, e.g., Innovative Health Sys. v. City of White Plains,* 931 F.Supp. 222, 229 (S.D.N.Y. 1996).

The Plaintiffs' decision not to make any proper applications to the Village for the right to operate a residential recovery cen-

---

**6.** *Tsombanidis v. W. Haven Fire Dep't.* 352 F.3d 565 (2d Cir.2003); *Sunrise Development, Inc. v. Town of Huntington, New York,* 62 F.Supp.2d 762 (E.D.N.Y.1999); *Oxford House, Inc. v. Town of Babylon,* 819 F.Supp. 1179 (E.D.N.Y.1993); *Conn. Hospital v. City of New London,* 129 F.Supp.2d 123, 128 (D.Conn.2001); *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450 (D.N.J. 1992); *Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1331 (D.N.J. 1991).

ter calls into question whether their request for a preliminary injunction is ripe at this time. In *Tsombanidis v. City of West Haven*, 129 F.Supp.2d 136 (D.Conn. 2001), a group home of non-related, recovering alcoholics, alleged that the plaintiffs discriminated against the defendants by imposing upon them more stringent zoning code requirements than others living in the same housing zone. The District Court held that the plaintiffs' suit had not ripened on the ground that plaintiffs never availed themselves of any administrative procedures, such as applying for a special use permit, which would have allowed the city to decide whether to accommodate the plaintiffs' requests. *Id.* at 160–61; *see also Oxford House–A v. City of University City*, 87 F.3d 1022 (8th Cir.1996)(holding that a lawsuit alleging defendant's discriminatory zoning provision was premature where plaintiff had not attempted to exhaust local administrative zoning remedies before filing suit); *United States v. Village of Palatine*, 37 F.3d 1230 (7th Cir.1994)(holding that plaintiff's reasonable accommodation claim was not ripe for adjudication because the plaintiff had not requested a special use exception from the Village). "In our view, Congress also did not intend the federal courts to act as zoning boards by deciding fact-intensive accommodation issues in the *first instance*." *Tsombanidis*, at 161 quoting *Oxford House–C v. City of St. Louis*, 77 F.3d 249, 253 (8th Cir.1996)(emphasis added).

Ideally, the submission of at least one purposeful application that is subsequently denied, meets the finality requirement. *Sunrise Dev., Inc.*, 62 F.Supp.2d at 770. On the other hand, "litigants are not required to [engage in] futile gestures to establish ripeness." *Id.* The finality requirement can be fulfilled by showing that "any further efforts to work within administrative apparatus would be an exercise in futility." *Id.*, quoting *Easter Seal Society of New Jersey v. Township of North Bergen*, 798 F.Supp. 228, 236 (D.N.J.1992). Similarly, standing is also a matter addressed within the language of the ADA itself: "Further, the explicit grant of standing to anyone who believes he '*will* be injured by a discriminatory housing practice that is about to occur,' 42 U.S.C. § 3602(i), means that a person who is likely to suffer such an injury need not wait until a discriminatory effect has been felt before bringing suit." *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir.1995)(emphasis in original).

Plaintiffs never submitted an application to the Village for a use variance or special permit. Therefore it cannot be said that a purposeful application was ever made. Plaintiffs argue that their complaint and this motion are nevertheless are ripe on the ground that the Village's decision to condemn the Premises has cut off the Plaintiffs' ability to submit a use variance or special permit application as "no amount of variance or other zoning related applications to the Village can have any effect on the condemnation." (Pls.' Mem. at 24) Moreover, none of the cases Plaintiffs rely on involve a municipality's decision to condemn property as a pre-text for discrimination against disabled persons.

The Village's decision to condemn the Premises is not a final action, however, as the condemnation must still be approved by the Appellate Division of the Supreme Court of the State of New York under EDPL § 207.[7] The Appellate Division's

---

7. Judicial review

(A) Any person or persons jointly or severally, aggrieved by the condemner's determination and findings made pursuant to section two hundred four of this article, may seek judicial review thereof by the appellate division of the supreme court, in the judicial department embracing the county wherein the proposed facility is located by the filing of a petition in such court within thirty days after the condemners's completion of its publication of its determination and findings pursuant to sec-

mandate allows for more than a just a cursory review of whether the condemnor followed certain procedural requirements:

(C) The court shall either confirm or reject the condemner's determination and findings. The scope of review shall be limited to whether:

(1) the proceeding was in conformity with the federal and state constitutions,

(2) the proposed acquisition is within the condemner's statutory jurisdiction or authority,

(3) the condemner's determination and findings were made in accordance with procedures set forth in this article and with article eight of the environmental conservation law, and

(4) a public use, benefit or purpose will be served by the proposed acquisition.

EDPL § 207(C).

■ The fact that the Plaintiffs have an avenue of relief available to them in State court begs the question as to whether this Court should abstain from hearing Plaintiffs' request for a preliminary injunction even if their opportunity to file an application for an accommodation has been curtailed.

A federal district court may, in its discretion and only in exceptional circumstances, abstain from hearing a case over which it has jurisdiction in deference to a parallel and duplicative action in state court. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15–16, 19, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). When abstention pursuant to *Colorado*

*River* is considered, the threshold inquiry is whether the state action and the federal action are essentially the same, i.e., are they "parallel" litigations. *AMNEX, Inc. v. Rowland*, 25 F.Supp.2d 238, 243 (S.D.N.Y.1998). Complete identity of parties and claims is not required; the parallel litigation requirement is satisfied when the main issue in the case is the subject of already pending litigation. *See Weiser v. Koch*, 632 F.Supp. 1369, 1386 (S.D.N.Y. 1986); *see also Machat v. Sklar*, No. 96 Civ. 3796, 1997 WL 599384, at *7, 1997 U.S. Dist. LEXIS 14803, *22 (S.D.N.Y. Sept. 29, 1997).

Alternatively, abstention may be claimed under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Under the *Burford* doctrine, federal abstention may be warranted when the state law or regulation at issue is part of a unified regulatory scheme on a complex subject matter of special state interest and the issues sought to be adjudicated primarily involved issues of state law. *See Law Enforcement Ins. Co. v. Corcoran*, 807 F.2d 38, 43 (2d Cir.1986).

In this case, the Plaintiffs have claimed discrimination by the Village under the FHA, the ADA, and the Rehabilitation Act. Even though the legal principles supporting these anti-discrimination statutes are grounded on constitutionally derived protections, the Appellate Division's mandate under the EDPL does not necessarily encourage or require review of the condemnation for violations of these statutes. Viewed in this light, the State condemnation proceedings will not parallel or duplicate a decision by this Court as to whether the Village's decision to condemn the Premises amounts to pre-textual discrimination.[8]

---

tion two hundred four herein.... EDPL § 207.

8. Neither Party cited, and the Court has not found, any Second Circuit cases which address the question of whether a district court should refrain from hearing cases in which a

municipality is alleged to have used state condemnation proceedings as a pretext for discrimination on the ground that the abstention doctrines prohibit jurisdiction. Plaintiffs do cite to several non-Second Circuit decisions, which in sum support the principle, that in

## Standing

■ Plaintiffs contend, and the Village contests, that the residents living at the Premises are individuals recovering from alcohol and drug addiction and are considered disabled under the FHA, the ADA, and the Rehabilitation Act. (Compl. ¶¶ 70, 80, 90; Defs.' Pre–Hr'g Mem. at 21).

This Circuit has held that individuals living at a halfway house [9] for recovering alcoholics meets the two part definition of disability set forth in the FHA, the ADA, and the Rehabilitation Act, on the grounds that because the clients were "unable to abstain from alcohol abuse without continued care, absent assistance, they cannot care for themselves." *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 47–48; *see also Oxford House, Inc. v. Babylon*, 819 F.Supp. 1179, 1182 (E.D.N.Y.1993)(J. Wexler)(holding that "[i]t is well established that individuals recovering from drug or alcohol addiction are handicapped under the FHA."). Neither Party addresses this issue in their post-hearing memoranda. For the purposes of this motion, this Court considers the resident Plaintiffs to be disabled under the FHA, the ADA, and the Rehabilitation Act. Plaintiffs provided sufficient evidence at the preliminary injunction hearing establishing that the Residents are living at the Premises in order to receive treatment for their ongoing alcohol and drug addictions (Tr. 96, 99), without

which they could not carry out one or more major life activities. *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 47, quoting *Buckley v. Consolidated Edison Co.*, 127 F.3d 270, 274 (2d Cir.1997).

## Analysis

Aside from Plaintiffs' allegation that the Village's condemnation proceeding is a pretext for discrimination under the FHA, the ADA, and the Rehabilitation Act, this a classic case for abstention, particularly where there has been no application for relief under the Village's own laws. Full relief is also available to the Plaintiffs under New York's EDPL.

Having said that, this Court finds that the Plaintiffs are not entitled to the requested injunction on the following grounds:

### A. Preliminary Injunction Standard

"A party seeking a preliminary injunction must demonstrate '(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir.2004) quoting *Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94,

---

such instances federal jurisdiction is proper when, as here, federal anti-discrimination statutes are at the heart of the plaintiff's allegations. *See, e.g., Bryant Woods Inn v. Howard County, Md.* 124 F.3d 597, 602 (4th Cir.1997)(holding that jurisdiction is proper because plaintiff argued "that a federal anti-discrimination statute requires the county to make accommodation to its properly interpreted zoning ordinance"); *Fountain v. Metropolitan Atlanta Rapid Transit Authority*, 678 F.2d 1038, 1046 (11th Cir.1982)(cautioning federal courts from abstaining from hearing law suits merely because state condemnation proceedings are involved); *Bryant v. New Jer-*

*sey Dept. of Transp.*, 1 F.Supp.2d 426, 439 (D.N.J.1998)(holding that abstention under *Buford* is not warranted where the federal antidiscrimination issues at the heart of the litigation do "not overlap with the complexities of the state regulatory scheme").

9. **Halfway House.** A transitional housing facility designed to rehabilitate people who have recently left a prison or medical-care facility, or who otherwise need help in adjusting to a normal life.—Also termed residential community treatment center. *Black's Law Dictionary* 731 (8th ed.2004).

96 (2d Cir.2002). Irreparable harm means injury for which a monetary award cannot adequately compensate a plaintiff. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

In a case like this in which " 'the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme,' the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir.1996) quoting *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989).

1. *The Plaintiffs have not demonstrated irreparable harm.*

■ Any injury suffered by the corporate Plaintiffs as result of the Village's condemnation proceeding may be compensated through a monetary reward and therefore is not irreparable. *See Jackson Dairy, Inc.,* 596 F.2d at 72.

Plaintiffs also did not demonstrate that the Residents will suffer irreparable harm. The Court of Appeals for the Second Circuit in *Innovative Health Systems,* affirmed the District Court's determination that patients of an alcohol and drug rehabilitation center will suffer irreparable harm because the patients would miss therapy sessions or drop out of the program altogether as a result of defendants' decision to block expansion of the plaintiff's new rehabilitation center. 117 F.3d at 43–44. Plaintiffs here claim that the same harm will befall the Residents on the ground that relocating the Residents would "directly result in their missing treatment appointments and some will inevitably drop out of the treatment program." (Buonanotte Decl. ¶ 50) Evidence provided to this Court during the two week long preliminary injunction hearing, refuted this conclusion.

First, testimony revealed that residents of Crossings Residents may be relocated at i) another Crossing's facility or ii) a non-Crossings facility on Long Island. (Tr. at 174–75, 183, 205) Mr. Goodwin, who is not a plaintiff in this lawsuit, undermined the Plaintiffs' contention that the resident Plaintiffs will suffer irreparable harm should the condemnation action proceed. Mr. Goodwin, a Crossings client, testified that his treatment would suffer if he had to leave the residence at 380 Bay Avenue. (Tr. 192–93) During cross-examination, however, he admitted that on December 1, 2004 he *voluntarily* requested and was allowed to transfer to the Premises from Crossings Residents' Brentwood, New York facility, where he had been residing since October 11, 2004. (Tr. 205–06) His voluntary transfer apparently had no detrimental effect on his treatment program.

Furthermore, in *Innovative Health,* the Court also considered as persuasive, testimony that the subject alcohol and drug treatment center needed to be relocated to the defendant's city as the old location was inaccessible to patients because of poor public transportation services. 117 F.3d at 43. Crossings Residents, however, provides private transportation for their clients from their residence to their treatment clinics. (Tr. at 54, 169)

This Court is not persuaded that the resident Plaintiffs will encounter any interruption in their treatment given the evidence that the residents may be transferred to the multiple Crossings' and non-Crossings' residences available in Nassau and Suffolk Counties, and the fact that residents are provided door to door transportation between their residence and the clinics.

2. *Plaintiff's have not demonstrated a likelihood of success on the merits.*

■ A plaintiff can prove a violation of the FHA, the ADA, and the Rehabilitation

Act under three legal theories: (i) intentional discrimination; (ii) discriminatory impact; or (iii) a refusal to make a reasonable accommodation. *Tsombanidis v. City of West Haven,* 352 F.3d 565, 573 (2d Cir.2003); *Innovative Health Systems, Inc.,* 117 F.3d at 45; *LeBlanc–Sternberg,* 67 F.3d at 425. Plaintiffs chose to proceed under the first theory, intentional discrimination. "The ultimate issue is whether 'discriminatory intent' has been shown … and the controlling analysis is to apply the *Arlington Heights* factors." (Pls.' Mem. at 17). As such, in their attempt to show that the Village acted with discriminatory intent, the Plaintiffs' post-hearing memorandum relies heavily on the criteria held by the U.S. Supreme Court in *Arlington Heights. v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and its progeny. In *Arlington Heights,* a village denied a non-profit, low-income housing development corporation's application for a zoning change. *Id.* The alleged motive behind the denial of the zoning application was racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* In deciding the case, the Court provided the aforementioned criteria as "subjects of proper inquiry in determining whether racially discriminatory intent existed." *Id.* at 268, 97 S.Ct. 555; *see also Reg'l Econ. Cmty. Action Program, Inc.* 294 F.3d at 35 (applying the intentional discrimination theory to claims filed under the FHA, the ADA and the Rehabilitation Act).

At first glance, a key difference exists between *Arlington Heights* and this case. Before closing on the contract, the plaintiff in *Arlington Heights* ensured that "the sale agreement was contingent upon [plaintiff]'s securing zoning clearances." *Arlington Heights,* at 256, 97 S.Ct. 555. An obvious and very important distinction, therefore, is that in the present case, Plaintiffs *never* filed an application for re-zoning, before or after purchasing the

Premises. The need to file an application for a zoning change, use variance, or special permit should not have been a surprise to Mr. Buonanotte. The Premises are located in a zone set aside for single-family residences. A residence for recovering alcoholics and drug addicts is properly found in Zoning District H. Patchogue Code Section 93–16.1, lists the types of facilities permitted within the H Business District. Listed is a category called "personal supervision facilities," which includes "residential treatment facilities," like the operations run by Crossings Residents. Furthermore, Village officials met with Mr. Buonanotte and his attorney and explained exactly what the Plaintiffs needed to do in order to occupy lawfully the Premises and operate a residential treatment facility in a neighborhood zoned for single family residences. The Mayor and the Village Attorney advised Mr. Buonanotte that he needed to apply to the Village's Board of Zoning Appeals for a use variance or special permit. He never did file the appropriate applications.

The other cases which the Plaintiffs rely on are also of no use. (Pls.' Mem. at 24–25) In each of these cases, the plaintiffs first sought relief by making applications to their respective municipalities before acquiring or using the property. *See, e.g., Tsombanidis v. West Haven Fire Dep't,* 352 F.3d at 578, 580; *Sunrise Dev., Inc.* 62 F.Supp.2d at 770. Neither the FHA, the ADA, or the Rehabilitation Act allows for an entity to plunk down within a community in an area or in a way forbidden by local laws without first making any attempts to comply with such laws.

### B. *Arlington Heights* Analysis

Even if Plaintiffs had made the proper applications to the Village Zoning Board and were then denied, the Village's decision to condemn the Premises does not

evince a discriminatory intent under the *Arlington Heights* analysis.

In order to find evidence of discriminatory intent, *Arlington Heights* requires courts to evaluate the following criteria: "(1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural events; and (5) departures from normal substantive criteria." *Tsombanidis*, 352 F.3d at 579–80.

(1) Discriminatory impact of the governmental decision

Plaintiffs argue that the Village condemned the Premises because of Mr. Buonanotte's proposed use of the Premises to house recovering alcohol and drug addicts.[10] As proof of the Village's bias against recovering alcohol and drug addicts, Plaintiffs refer to the fact that the Village refrained from condemning the Premises when it was used as a residence for senior citizens. Beyond questioning the timing of the condemnation, Plaintiffs fail to provide sufficient evidence to prove that the condemnation was the result of intentional discrimination.

Mayor Pontieri testified that the timing of the decision to condemn the Premises stemmed not from *who* occupied the Premises but whether or not the residences were occupied at all. (Tr. at 617) When Mayor Pontieri approached Mr. Bielecki about purchasing the property in August 2004—*sometime before Mr. Bielecki sold the Premises to Mr. Buonanotte*—Mr. Bielecki told the Mayor that he would not sell his properties to anyone unless the new owner would allow the residents to stay. Mayor Pontieri testified that purchasing or condemning the Premises while still occupied was unacceptable because of the cost of relocating the residents. (Tr. 352, 576–77) Unbeknownst to the Mayor, Mr. Bielecki had already contracted to sell his properties to Woodfield Equities, Inc. and had made plans to move out the residents. There is no doubt that the Village's interest in obtaining the Premises preceded Mr. Buonanotte's purchase. The Village's interest in the property was understandably dropped, however, because of Mr. Bielecki's duplicitous representations.

Plaintiffs further allege that the Village's zoning laws are discriminatory on the grounds that the Village does not now provide a zoning district in which a residential recovery center could operate, and that Plaintiffs are forced to apply to amend the Village's zoning map pursuant to Patchogue Code § 093–54 in order to create a hospitable zone for their recovery center. In *Sunrise Development*, the Court held that a local law requiring plaintiffs to apply for a re-zoning application was discriminatory on its face as the law made it more onerous for a particular group of citizens—disabled and senior citizens—to acquire housing. 62 F.Supp.2d at 774.

This Court sees no merit in this argument. Plaintiffs ignore the fact that they never gave the Village the opportunity to approve or reject a zoning change application. Further, Plaintiffs provide no evidence that the use variance or special permit procedures are applied in a discriminatory manner.

Plaintiffs suggestion that they were required by the Village to submit a re-zoning application is false. Time and again Village officials advised Mr. Buonanotte that he could apply to the Board for Zoning Appeals for a use variance or special per-

---

10. The term "proposed" is used loosely here as there is ample evidence that in an affront to Village law, Mr. Buonanotte is already using the Premises as a residential facility for its Crossings Center clients. (See Tr. 178–221)

mit rather then initiating a complicated and time consuming re-zoning application. Had the Plaintiffs applied for either of these two options and the Village rejected such applications, then perhaps the Plaintiffs would be able to make the argument that the Village's actions had a discriminatory impact on the Plaintiffs. Plaintiff inexplicably failed to apply for either exception despite ample opportunity to do so. Plaintiffs alone are responsible for painting themselves into a corner.

Moreover, Plaintiffs offered no evidence to eliminate the possibility that the reason that an H District is absent from the Village's zoning plan is because no application has ever been made for this type of zoning. Finally, two residential care facilities for recovering addicts already exist in the neighboring Town of Brookhaven. These "sober houses" are located on Bay Avenue, the same avenue on which the Premises are located. (Tr. 238) Their close proximity to the Village—literally across the street—likely obviated the need for an H District within the relatively small Village of Patchogue.

(2) The decision's historical background

Plaintiffs intended to show during the preliminary injunction hearing that the Village conjured up the need to expand and relocate several key community services as a ruse to explain their decision to condemn Mr. Buonanotte's property. The Plaintiffs tried to show that there were no long term plans on the Village's proverbial drawing board to expand the Shore Front Park complex or relocate the Four Sister's Community Center and the other Village groups, before the Plaintiffs moved into the Village.

Mayor Pontieri testified, however, that it was his goal as a newly elected official to relocate several organizations, including the Four Sisters community center. As a life long resident of the Village and past member of the Board of Trustees, he was intimately aware of the need to relocate the Four Sisters Community Center and the other groups. The Mayor manifested his desire to complete the relocation project by hiring an architect to draw up plans for a potential relocation site soon after he took office and before Mr. Buonanotte purchased the Premises.

After Village officials discovered that Mr. Bielecki sold the Premises to Mr. Buonanotte, they met with and explained to Mr. Buonanotte what he needed to do to effect his plans to operate a residential recovery center. The Village did not seek condemnation proceedings at that time, but rather provided the Plaintiffs with exactly the same opportunity the Plaintiffs now ask this Court to compel, that is an opportunity to apply to the Board of Zoning Appeals for a use variance or special permit. It is not discrimination to compel compliance with the law, particularly when Plaintiffs decided to wait two months after being told they must apply for a use variance or special permit from its Board of Zoning Appeals and more than three months after the Plaintiffs acquired its Premises, moved "recovering" patients in, and commenced operating in violation of the Village's laws with which undoubtedly they knew they had to comply. The Plaintiffs virtually admit this in the last pages of their brief. (Pls.' Mem. at 26–28) Plaintiffs try to turn the argument around on its head by stating that "it was in response to Plaintiffs' indication that they would seek reasonable accommodations through the variance and/ZBA [Zoning Board of Appeals] process that led to the Village's scheme to condemn the [Premises]." (Pls.' Mem. at 25) Plaintiffs have not ever attempted to file an application before or after the Village Board announced that it intended to commence condemnation proceedings, or on any date down to this very

date. To this Court, this destroys their whole point.[11]

### (3) The specific sequence of events leading up to the challenged decision

The Court in *Sunrise Development*, held that evidence of strong hostility by opposition groups against a group home for recovering alcoholics was indicative of discriminatory intent. 62 F.Supp.2d at 775.

In this case, Plaintiffs argue that the Village's decision to condemn the Premises was largely the result of a "flurry of community opposition" to the operation of a residential alcohol and drug addiction recovery center in their neighborhood. (Pls.' Mem. at 5) Plaintiffs tried but were unable to produce substantive evidence of staunch community opposition during the preliminary injunction hearing. For example, Plaintiffs describe "community flyers and protests" as components of a "flurry of community opposition" against the proposed residential recovery homes. (*Id.*) As evidence of this opposition, Plaintiffs introduced a single flyer found posted in a Village delicatessen, the content of which urged residents to contact their legislative representatives to prevent the Plaintiffs from operating a sober home on Bay Avenue as two other sober homes already exist on Bay Avenue. The flyer is unsigned. Although Mayor Pontieri recalled seeing a copy of the flyer, there was no evidence presented that the flyer influenced the Mayor's decisions in any way. (Exs. 39(A) & 39(B); Tr. 323–33)

There was also testimony that an unidentified person scrawled the words "next sober house" on the Halcyon Manor sign at 380 Bay Avenue. (Tr. 50) This incident was an isolated event. Plaintiffs also produced several local news articles and Village Board meeting minutes, which contained quotes from Village officials and community members expressing their concerns over the Plaintiffs' decision to move into the Village and operate a recovery center without having made the proper applications. The Village's position is exemplified by Mayor Pontieri's assertion at one public meeting, in which he stated that his "problem was never with the residents, but rather with the residence they were in and how it was managed." (Ex. 21) Only four community residents spoke out against the Plaintiffs' proposed use of the Premises at the September 13, 2004 Village meeting; three were actually Village residents. (Tr. 565–66) At another public meeting held on September 27, 2004, two Village residents spoke out in opposition Mr. Bunonanatte's business on Bay Avenue. (Tr. 572)

The volume and content of the opposition exhibited by a few citizens of the Village of Patchogue stands in great contrast to the community outcry found in a similar case, in which opposition to a group home for recovering alcoholics was so virulent that the Town had to suspend its normal rules at a public meeting addressing the issue because so many citizens attended the meeting. *Oxford House, Inc. v. Babylon*, 819 F.Supp. 1179, 1184 (E.D.N.Y.1993). During the meeting, certain residents made outrageous comments, such as urging the Town to rid the community of the threat of "irrational" and "un-

---

11. Even if, as the Plaintiffs allege, the Village confused the Plaintiffs by first telling Mr. Buonanotte that he should apply for a use variance, and yet later told a newspaper reporter that the Village preferred an application for a zoning change, the Plaintiffs still had nearly a month to comply once the issue was made crystal clear by the Village Attorney's October 14, 2004 letter. In that letter, Mr. Snead specifically states that the Village is waiting for the Plaintiffs to file a *use variance*. The Village Board did not hold a public hearing to discuss the proposed condemnation until November 15, 2004, over a month later.

predictable" people. *Id.* One individual explained that he was concerned that an elderly neighbor would have a heart attack if one of the Oxford House residents attempted a home invasion. *Id.,* at 1184 n. 8. Judge Leonard Wexler of this Court held that the community opposition amounted to "substantial evidence to indicate that the Town had the intent to evict them *because they were recovering alcoholics.*" *Id.* at 1184 (emphasis added).

In *Oxford House,* the resistance consisted of irrational outbursts directed towards the individual residents and their disability, whereas the few comments attributed to Village residents in this case were focused on their concern with the over-saturation of sober homes along Bay Avenue. (Exs. 21, 38) The flyer, graffiti, and a smatter of public comments on the over saturation of sober homes along Bay Avenue, do not amount to evidence of strong community opposition.

(4) Departures from the normal procedural events

There was no evidence that the Village's condemnation proceedings were not in substantial compliance with New York's EDPL. A public hearing was properly noticed and held. Plaintiffs, along with the owner of 400 Bay Avenue, attended the meeting and voiced their opposition. The Village Board left open the proceedings an additional four days to allow the public to provide additional information.

Plaintiffs allege minor improprieties by the Village in their pursuit of the condemnation. (Pls.' Mem. at 9) For example, the Village hired an appraiser for the purposes of valuating the properties targeted for condemnation prior to receiving the Village Board's approval. Once hired, the appraisers allegedly surveyed the Premises without complying with EDPL § 404, which mandates that proper written notice is provided to the property owner before conducting a survey. Plaintiffs also allege the Village failed to inform the public that alternative sites existed which could have satisfied the Village's needs, specifically other properties adjacent to the Shore Park Complex and the Brookhaven Town Hall.

This Court agrees with the Village that these alleged irregularities do not arise to the level of a substantive departure from the normal conduct of condemnation proceedings as described in New York's EDPL. (Defs.' Mem. at 20–21) This Court further disagrees with the Plaintiffs' allegation that Mayor Pontieri failed to apprise the Board of Trustees and the Village community at large, that viable alternatives to the Premises existed which could satisfy the Village's relocation needs.

The Plaintiffs are correct in that several other lots do abut the Shore Front Park complex and could conceivably also be used to expand the park and house governmental units. (Tr. 622) Mayor Pontieri testified that because these lots are relatively small, the Village would have to purchase several lots in order acquire space equal to the Premises and the 400 Bay Avenue, a move that is cost prohibitive given current property values. (Tr. 658) During the preliminary injunction hearing, Plaintiffs also touted the availability of the Brookhaven Town Hall ("Town Hall") as a viable relocation site for the Four Sisters Community Center and the other organizations, and argued that the Village's decision not to present this alternative site to the Village citizens is a clear sign that the condemnation proceedings were a pretext and discriminatory. (Tr. 441–56) Mayor Pontieri responded that the Town Hall was not in the Village's possession at the time the condemnation proceeding was initiated and therefore mentioning the availability of the Town Hall would

have been premature. (Tr. 549) Furthermore, even if the Village had acquired the Town Hall, the building is located in the middle of a busy, commercial district, hardly the type of location conducive to a community and youth center. (Tr. 548) The Premises and 400 Bay Avenue, however, are adjacent to already existing park space and recreational fields. Furthermore, the Mayor testified that the Village was in the midst of discussions with officials of Suffolk Community College and Stony Brook University concerning the possibility of the Village leasing the Town Hall as classroom space. (Tr. 550) If approved, a lease with one of these schools could generate for the Village income of approximately $150,000.00–200,000.00 per year, and would be a boon to the Village's downtown commercial economy. (*Id.*) The Town Hall is also ideally located within a short walking distance to the Patchogue Long Island Rail Road station, making a potential campus site easily accessible to commuting students. (Ex. A)

This Court finds no merit to the Plaintiffs' allegation that Village officials were playing hide the ball by not offering the Town Hall to residents as an alternative site.

Plaintiffs also argue that the Village departed from the normal procedural events on the ground that two Village officials visited the Premises without Mr. Buonanotte's permission. The Plaintiffs fail to demonstrate that a visit from the Village's Fire Marshal and Building Inspector was an uncommon or devious sign of discrimination. Defendant Nudo, the Village Building Inspector, testified that it is common practice for him to visit properties that have undergone new ownership. (Tr. 678–79) Mayor Pontieri testified that he has a genuine concern for the safety of its residents as a fire in an illegally converted house took the life of a Village resident earlier in 2004. (Tr. 561) Mr. Goodwin

also testified that Mr. Buonanotte was configuring some of the bedrooms in the Halcyon Manor to allow for two to three beds, an issue which raises health and safety concerns for the Village. (Defs.' Mem. at 15, n. 17) This Court views these infrequent visits as a part of the Village's duty to determine whether the Plaintiffs were in compliance with local health and safety laws and they are not the result of any motive to discriminate against recovering alcoholics and drug addicts.

Plaintiffs further argue that the Village showed its true motivation behind their decision to condemn the Premises when the Building Inspector, Defendant Nudo, issued two summonses to the Plaintiffs for their failure to apply for rental permits or a use variance before occupying the Premises. Plaintiffs' argue that the decision to direct the summonses to Crossings Residents vice Woodfield exposes the Village's animosity towards the residents and not management. This is a vacuous argument. Mr. Nudo testified that the reason he directed the summonses to Crossings Recovery Center, Inc. is because when he first visited the Premises in September 2004, he was told by an employee that all inquiries should be directed to Mr. Buonanotte. (Tr. 692–93) The employee handed Mr. Nudo a card for Crossings Recovery Center, Inc. Mr. Nudo used the address on this card when he drafted the summonses. (*Id.*) This insignificant matter is simply a case of mistaken identity that could have been avoided had the Plaintiffs made a proper use variance or special permit application to the Village on behalf of Woodfield.

The fact that the condemnation proceedings are still open to review by the Appellate Division, Second Department, further negates the argument that the Village has abrogated the normal procedural events because the Village has not taken away the

Plaintiffs' right to appeal the action. In comparison, the Town Supervisor in *Sunrise Development* broke precedence and initiated a local law banning the type of residence sought by the plaintiffs, and at the same time quashed the plaintiff's right to apply for a zoning change. 62 F.Supp.2d at 775. A grandfather clause in the law allowed an application for a zoning change to go forward, but only if a public hearing had already been held on the application. *Id.* The Town enacted the law the day before a public hearing was scheduled to hear plaintiff's application for a zoning change, therefore preventing the plaintiff from proceeding. *Id.*

In this case, the condemnation proceedings have yet to be reviewed by the Supreme Court of the State of New York, Appellate Division. The normal procedural rights are still available to the Plaintiffs, who thus far have declined the opportunity to apply for a use variance or special permit. Here, the Village is using the existing State eminent domain laws to advance a plan that the Village citizenry believes is in the best interest of the community. Unlike the defendants in *Sunrise Development*, Village officials did not abuse their legislative powers to craft a special law discriminating against the Plaintiffs and preventing them from appealing.

(5) Departures from normal substantive criteria

The Village demonstrated that it has had for a substantial period of time reasons to acquire the Plaintiff's property through purchase or condemnation. Six governmental units, located a distance apart from each other and from the portion of the Village most relevant to their existence, benefit from their consolidation on the Plaintiff's property. The Village had to address and seek solutions to unify these units. The Village had a legitimate request from its citizenry and was under pressure to satisfy the growing Ecuadorean community's need for a regulation-size soccer field on Village park space. Had the Village not taken the opportunity to condemn the Premises and adjoining, it might well have had a legitimate claim made against it by the citizens for failure to provide necessary services.

C. Legal Right to Occupy the Premises.

Plaintiffs assert that they have a legal right to occupy the Premises despite the Village's position that Mr. Buonanotte must make an application to the Village requesting a use variance or special permit. Plaintiffs argue that because Mr. Bielecki possessed valid rental and fire permits, Plaintiffs argue that they may now rely on those same permits on the ground that "zoning deals basically with land use and not with the person who owns or occupies it." *Matter of Dexter v. Town Bd. of Gates*, 36 N.Y.2d 102, 105, 365 N.Y.S.2d 506, 324 N.E.2d 870 (1975); *see also Matter of St. Onge v. Donovan*, 71 N.Y.2d 507, 527 N.Y.S.2d 721, 522 N.E.2d 1019 (1988); *FGL & L Property Corp. v. City of Rye*, 66 N.Y.2d 111, 116, 495 N.Y.S.2d 321, 485 N.E.2d 986 (1985); *Matter of Weinrib v. Weisler*, 27 N.Y.2d 592, 313 N.Y.S.2d 407, 261 N.E.2d 406 (1970). In New York, a municipality may not condition the sale or transfer of property by insisting that the property conform to a certain use, in order to prevent a new owner from enjoying the same land-use benefits as the seller or transferor. This legal principle holds true even in those instances in which the previous owner's use of the land did not conform to its zoned and lawful use. In other words, "a variance runs with the land and, 'absent a specific time limitation, it continues until properly revoked.'" *Matter of St. Onge*, 71 N.Y.2d at 520, 527 N.Y.S.2d 721, 522 N.E.2d 1019 quoting *2 Anderson, New York Zoning Law and Practice* § 23.53 [3d ed].

Plaintiffs' reliance on these cases is misplaced for several reasons. First and foremost, with the exception of *Matter of Weinrib,* the plaintiffs applied to the local municipality for a use variance or re-zoning request. 27 N.Y.2d at 592, 313 N.Y.S.2d 407, 261 N.E.2d 406. Second, in *Matter of Weinrib,* the Court of Appeals of New York decided the question of whether a *building* permit may survive a property transfer. *Id.* The issue in this case is whether Plaintiffs have made an application for a *rental* permit. The Village claims an application for a rental permit is necessary given the fact that Plaintiffs intend to expand the number of residents per room in the Halcyon house from one to three persons, a move which may violate of the Village's health and safety code. (Defs.' Mem. at 28) Also, Mr. Buonanotte plans to house additional residents in the cottage at 380 Bay Avenue and on the property at 390 Bay Avenue. No rental permits exist for these properties. (*Id.* at 29) Third, even though Mr. Bielecki's use of the Premises was nonconforming, the Plaintiffs' proposed use of the Premises is different. Plaintiffs are not operating a residence for senior citizens. Under the Village's Code, a senior citizen residence like the one Mr. Bielecki operated is properly zoned in an RH Residence District, whereas a supervised care facility like Crossings Residents, is properly located within an H Business District. Even Ms. Sarah Navas, Vice President of Operations, Crossings Recovery Centers, Inc. and the only employee of the Crossings' enterprise who took the witness stand, testified that the use of the Premises property under Mr. Buonanotte's ownership *is* different than the previous owner's use. (Tr. 122)

## Conclusion

The Court is not wont to rescue Plaintiffs from their self-created dilemma. Mr. Buonanotte is a sophisticated businessman who owns and operates several recovery clinics and residences in Nassau and Suffolk Counties. He knew, or certainly should have known, that prior to operating a business in a residential district, he needed to abide by the local laws.[12]:

Had Plaintiffs made the proper zoning and rental permit applications and then the Village denied them without affording reasonable accommodations, this Court might have been more likely to view the Village's actions under the scrutiny required by *Arlington Heights* and its progeny.

In sum, it is clear that:

1. Mr. Bononatte, as the CEO and President of Woodfield Equities, L.L.C., et al., did not take the stand and testify.

2. Mr. Bononatte, with full knowledge that he was required to do so,

a. never filed for, or otherwise sought a permit from the Village Board of Zoning Appeals seeking authority to operate a residence for adults undergoing alcohol and drug addiction treatment in an area zoned for single family residences;

---

12. The codification of the ordinances and local laws of the Village of Patchogue reflects an appreciation of the needs of a progressive and expanding community. As in many other municipalities, officials are faced with fundamental changes that involve nearly every aspect of community life. Problems increase in number and complexity, and range in importance from quotidian details to crucial areas of civic planning. It is the profound conviction of General Code Publishers that this Code will contribute significantly to the efficient administration of local government. As Samuel Johnson observed, "The law is the last result of human wisdom acting upon human experience for the benefit of the public."

Patchogue Code, p. v, Acknowledgment.

b. moved clients adults into the premises without obtaining a permit or zoning change;

c. refused access to Village and other authorities to determine the extent of his violations of the law; and

d. operated his adult recovery home business in willful defiance of the law.

The Plaintiffs' motion for a preliminary injunction is **DENIED.**

**SO ORDERED.**